## THE HONORABLE DISTRICT JUDGE RAMOS

| | |
|---|---|
| Private Attorney General,  Messiah Ali Bey) | **Case No.  20 CV 5574** |
| In full Capacity, Standing & Status        ) | |
| On the behalf of the Moorish Son's and     ) | **Notice of Motion to be Restored** |
| Daughters of Light International institute, ) | |
| Moorish American Society at Large           ) | |
| Conscious and un-conscious in the U.S.A.    ) | |
| With full legal Capacity, Standing & Status ) | |
| *Plaintiff(s)*                             ) | |
| -v-                                        ) | |
| DONALD J. TRUMP                            ) | |
| D.B.A. THE UNITED STATES                   ) | |
| &                                          | |
| THE ESTATE OF                              ) | |
| ABRAHAM LINCOLN                            ) | |
| _____*Defendant* _____   ) | |

RECEIVED SDNY PRO SE OFFICE 2020 AUG 17 AM 11:57

PLEASE TAKE NOTICE that Plaintiff in error, will move this in this court  before the Honorable District

Court Judge Ramos  at 500 Pearl at 930 in the am or forenoon or whatever time defendant can be heard

or that it be heard on the motion to restore the complaint to the calendar after a determination on the

Tucker Act 28 USC 1491 and the validity of section 25 of the Judiciary Act of 1789 has been adjudicated

within the meaning of the Act of Congress, pursuant to the Federal Constitution Art 3 section 2, Article 6

section 2, and Article  16 of the Treaty of Peace and Friendship 1836 enforced in the United States of

America.

Date *Aug 17, 2020*

I submit a Memorandum of Law, my own declaration, and a copy of constitution of 1787, Treaty of

Peace and Friendship 1787-1836 Journal of Senate Apr.8th 1864, *Resolution 1202, Moorish Science*

*Temple Corporation papers, Proclamation from Mayor City of Fayetteville, Copyrights*

*Zodiac constitution + Nationality Card, Resolution 75, 1933      / 2021 2012 Senate*

1 | P a g e *Record 55727*

*9 Exhibits*

## THE HONORABLE DISTRICT JUDGE RAMOS

Private Attorney General,  Messiah Ali Bey)          **Case No.  20 CV 5574**

      In full Capacity, Standing & Status    )

      On the behalf of the Moorish Son's and   **)**     **Plaintiff in Error Declaration  in Support**

      Daughters of Light International institute,  **)**     **To Be Restored to the Calendar**

      Moorish American Society at Large    )     **and Amend Plaintiffs Complaint**

   Conscious and un-conscious in the U.S.A.   )

  With full legal Capacity, Standing & Status   )

               *Plaintiff(s)*          )

                  -v-           )

         DONALD J. TRUMP      )

     D.B.A. THE UNITED STATES    )

                & 

        THE ESTATE OF       )

       ABRAHAM LINCOLN      )

_____ *Defendant* _____)

### DECLARATION  OF RELEVANT FACTS OF HISTORY AND NOTORIETY

1.  I Messiah Ali Bey the Plaintiff in error makes this Declaration annexed with exhibits for motion

    to restore to the calendar and to amend the plaintiffs' complaint. This motion is made for the

    purpose of being restored to the calendar with the illustrated annexed exhibits that

    demonstrate the nature of a live controversy by the United States infringing on an Article in the

    Treaty of Peace and Friendship where it stipulated that we, the Moors, were not to be made

## THE HONORABLE DISTRICT JUDGE RAMOS

Slaves but slavery did occur, Art 16.   Art. 24 states: If any differences shall arise by either party infringing on any of the articles of this Treaty , peace and harmony shall remain notwithstanding in the fullest force until a friendly application shall be made for an arrangement and until that application shall be rejected no appeal shall be made to arms.

2. Plaintiff in error as descendants of Moroccans born in America  has invoked the  full protection of the Moroccan Treaty of Peace with the United States and in this writing the plaintiff will demonstrate the plaintiffs Nationality  by overcoming the element of a frivolous filing by establishing in the record the genuine link of plaintiffs nationality and plaintiffs progenitors nationality for such purposes and protection, with all rights under the full weight of the law Under the Constitution of the United States of America 1787 & the Treaty of Peace and Friendship with the Empire of Morocco, 1787-1836. The plaintiff in error believes the Court made a grave error in dismissing the Plaintiffs' case sua sponta and now plaintiff in error moves for the Courts re-consideration and reversal of that decision and restores the complaint to the calendar with an approval to amend the complaint going forward.

3. The Plaintiff do not subscribes to the courts illustrated proposition although there is nothing wrong with construing a pro se pleading liberally as cited by this court. In the decision citing Harris v mills 572 F 3d 72(2nd cir 2009) and to interpret them to raise the strongest claims that they suggest Triestman v fed bur of prisons 470 f3d 471, 474(2nd cir 2006). Plaintiff would hope that it is the case going forward.  Plaintiff thought the plain language of my statement in my complaint was sufficient to meet the standard of FRCP 8 because it was not a lack of clarity as a reason for the dismissal..

4. First the plaintiff in error would like to clear up something.  The Plaintiff never stated as construed by the Court that "Thirteenth amendment to the United states constitution, the Moroccan Treaty of Peace and Friendship 1787-1836,United Nations declarations governing

## THE HONORABLE DISTRICT JUDGE RAMOS

human rights and the rights of indigenous people," declarations on the use of scientific and technological process in the interest of peace and for the benefit of mankind, "Unspecified federal statutes, federal criminal statutes, Title 17 Copyrights law of Great Seal Zodiac Constitution  by Charles Mosley Bey" and state tort law.  Plaintiff seeks damages and other relief for the history of slavery in the United States beginning in 1619 and the resulting economic disparity that he alleges continues until the present day.  However, the structure of the sentences constructed takes away from the substance of our claim and I don't think that was written by the plaintiff in error in that way.

5. But Plaintiff in error did remember saying something to this effect " the courts federal jurisdiction under the constitution and treaty and diversity of plaintiff national status plaintiff argued that this issues are arising  under Trademark law by which the issue of labeling and branding lead to the trademark  franchising of people of Moorish descent by conversion to property in violation of the 5th amendment  and franchised as American Commerce out as Negro Black and Colored Slave Brand Labels by a sophisticated  scientific manufacturing method of "dehumanization" 2 that  reduced their genetic situation and status from natural people to subhuman conditions, 3 reduced their legal status to real  property and 4 trademarked and marketed them as slaves as a method of commerce in America .

6. The initial fraud began with a violation of Article 16 of the Moroccan Treat of Peace and Friendship with the Moorish Empire 1786-1836 ["Not to be made Slaves" was a "gross[infringement] violation" and it was after that event in history the Moors were labeled black Negro and Color. However, the issue at this point rest on the proposition whether there is a genuine link of nationality between the Moroccan Empire and the Moorish people of America which the plaintiff in error declared  beyond shadow of a doubt to be true  and if we are which there is no doubt, then the plaintiff in error in this case should be able proceed to restored to

## THE HONORABLE DISTRICT JUDGE RAMOS

the calendar so service can be processed and  the defendant can address the merits of the

complaint, SLAVERY and Article 16 of the Moroccan Treaty of Peace concerning the United

States concerning  the Moorish People of America.

7. One account of State history that is corroborated  is recorded as a Petition that  was presented

to the House from Sundry Free **Moors**, Subjects of the Emperor of Morocco; and residents in

this State, praying that in case they should Commit  Any Fault amenable to be brought to

Justice, that they as Subjects to a Prince in Alliance with the United States of America, may be

tried under the same Laws as the Citizens of this State would be liable to be tried, and not under

the Negro Act, which was received and read. [The humble Petition of Francis, Daniel, Hammond

and Samuel, (Free **Moors**) in behalf of themselves and their wives Fatima, Flora, Sarah and

Clarinda, Humbly Sheweth That your Petitioners some years past had the misfortune while

fighting in the defense of their Country, to be captured with their wives and made prisoners of

War by one of the Kings of Africa. That a certain Captain Clark had them delivered to him on a

promise that they should be redeemed by the Emperor of Moroccan Ambassador then residing

in England, in order to have them returned to their own Country: *Instead of which* he brought

them to this State, and sold them for slaves. Since that period they have by the greatest industry

been enabled to purchase their freedom from their respective Masters: And now prayeth your

Honorable House, that as free born subjects of a Prince now in Alliance with these United

States; **that they may not be considered as subject to a Law of this State (now in force) called

the negro  law:** but if they should unfortunately be guilty of any crime or misdemeanor against

the Laws of the Land, that they may have a just trial by a Lawful Jury. And your Petitioners as in

duty bound will ever pray.] 1 Ordered That it be referred to a Committee, the following

Gentlemen were accordingly appointed, Mr. Justice Grimke, General Pinckney & Mr. Edward

Rutledge.  Mr. Edward. Rutledge reported from the Committee to whom was referred the

petition of the Free **Moors**, which he read in his place and afterwards delivered it in at the Clerks

Table where it was again read for information. Ordered That it be taken into immediate

Consideration which read through was agreed to and is as follows Viz. Report That they have

Considered the same and are of opinion that **no Law of this State can in its Construction or**

**Operation apply to them,** and that persons who were Subjects of the Emperor of Morocco

**being Free in this State** are **not triable by the Law for the better Ordering and Governing of**

**Negroes and other Slaves**. Resolved That this House do agree with the Report.

8. Another account of Moorish notoriety was in the House of Representative of Pennsylvania in

1933 a resolution was adopted and passed recognizing the Moorish-American Contribution into

the American life it states**: In the City of Philadelphia there exists a Moorish-American Society**

**made up of Moors who have found here the end of their quest for a home and of the children**

**of those who journeyed here from the plains of Morocco. These [Moorish-Americans] have**

**since being here missed the use of the[ titles] and name annexations that were so familiar at**

**home.** [Here, denotes the genuine link of the origin of a foreign State.]

9. **Resolved That this House commends the Moorish-American Society of Philadelphia for the**

**efficient service it has rendered the Nation in bringing about a speedy and thorough**

**Americanization of these former Moors and that in accordance with the fullest right of**

**religious independence guaranteed every citizen we recognize also the right of these people**

**to use the name affixes El or Ali or Bey or any other prefix or suffix to which they have**

**heretofore been accustomed to use or which they may hereafter acquire the right to use. On**

**the question, Will the House Adopt the resolution?**

10. **It was Adopted May 4,1933. This Historical link is a genuine link to our progenitors which**

**cannot be refuted and these are attached records exhibited as a point of reference on a State**

**and City Council level which is the same with South Carolina house of Representative Sundry**

## THE HONORABLE DISTRICT JUDGE RAMOS

**Free Moor Act, each showing remedial law for a right that already existed and not created although lacking a platform at that time because of the various undermining schemes of Moorish contributions was going on so that we would not know our history or nationality or birthrights in America.** likewise, **Resolution 1202 (1991**) Honoring the Moorish-American Society in Philadelphia " Whereas, The Moorish-American community recognizes assimilation as fundamental to become full Americans, yet also seeks to maintain the flavor of their cultural roots by the use of [titles], prefixes and suffixes which have been the [custom within this dynamic culture for centuries], See also 1836 Treaty of Peace and Friendship, Morocco and The United States, such history is compelling proof.

11. However, before these resolution , Our Prophet Noble Prophet Noble Drew Ali brought our **Charter**, **Nationality**, **Flag** and **Our Title** of our **Ancient forefathers the Moabites** by **inherited birthright Bey** and **El** and restored the Moors back into the Family of Nations in 1928 and the work done was recognized and celebrated by Mayors in all the States particularly, the Mayor of Chicago's Proclamation Rahm Emanuel December 2011. Wigmore on Evidence secs 1587,1597 says: In the Book called the Law in the Bible there is a legal argument, and the question is Authorship of the Pentateuch in part it states " In the first place, it is wholly consistent with the rules of evidence, that Moses' title to the authorship of the first five books of the Old Testament, established by contemporary testimony and resting secure over a lapse of centuries, cannot be overthrown by mere negative evidence or doubt, but the burden rests upon those asserting an adverse title to produce clear and convincing proof, before the vested right of the ancient title will be set aside. See also Leviticus 25-10 Bible KJV; moreover, Story, J., in Morris vs. Lessees, 7 peters, 558) Again, in accordance with the well-known rule of evidence, regarding judicial notice of those facts of history, which have been known for centuries, that Moses was

the author of the Pentateuch, would require no evidence to establish, because it affirmed by Holy Writ. (Wigmore, Evidence, sec. 2565)

12. Our written Constitution of proof of freedom with Nationality Card filed in the Library of Congress under the Department of Justice Truth A-1 AA222141 by Charles Mosley Bey.in 1947 and revised in 1952 is documented proof of nationality.  The federal certificate number is a valid link to Title 22 Chapter 2 section 141 concerning the extra territorial rights the United States possessed under the Treaty in Morocco that it relinquished in 1956 however, the extra territorial rights of the Moorish in America was not relinquished and was vested at the repeal of this Act, see attached document with vice President Nixon signature . **Vattel  on international law sec. 185 says : Every alliance made by a Republic is real in character, for it can only relate to the State in it's corporate capacity. When a Free People, a Democratic State, or an aristocratic Republic concludes a treaty the state itself is the contracting party' its agreements are not terminable with the lives of those who have drawn them up when the individual members of the body politic and of the government die and are succeeded by others' the State ever remains the same. Since, therefore, a treaty of this kind relates directly to the body of the State, and Nation are always the same, whatever changes take place in the form of the government and the treaty made with the Nation remains in force as long as the Nation exists.**

13. The Court has jurisdiction in Article III section II which states Jurisdiction to controversies which the United states shall be a Party to  extend to controversies between two or more States between a State and Citizens of another State between Citizens of different States between Citizens of the same State claiming lands under Grants of different States and between a State or the Citizens thereof , and Foreign States, Citizens or Subjects.

14. From  the plaintiff corroborated evidence plaintiff  believes the court made a grave error  in presuming that there is no genuine link to our Ancient forefathers as  an aggregate body politic

and that the United States could ignore.   Whether it was violated yesterday or a century ago as long, as it is still in force in the United states they are Obligated to make good on their contract and the Court should not think that just because it has sovereign immunity and therefore it can violate its Obligation and violate the rights of the Moorish People spoken of in Article 16 of the treaty of Peace and friendship. Plaintiff invokes Article VI cl 2 along with the Judiciary Act 0f 1789 Section 25 with other Federal Laws and Acts of Congress where immunity is waived.

15. As Private Attorney General on behalf of The Moorish Sons and Daughters of Lights my international Organization with its members with full standing capacity and right declare we are descendants of the Ancient Moabites/Moroccans, namely the Moorish who are born in America to represent our claims for the atrocities that were done the Moorish People by the United States are not frivolous and here are some more Historical reasons why this case should be restored to the calendar

16. July 31 2012 Congressional Record-Senate S5727 U.S.-Morocco Treaty of Peace and Friendship where Mr. Casey extended his congratulations to the Kingdom of Morocco on its 225th anniversary of the Peace and Friendship Treaty where he spoke before the senate he states; Negotiations for this treaty began in1783 and the draft was signed in 1786.Future Presidents John Adams and Thomas Jefferson were the American signatories. The treaty was then presented to the Senate, which ratified it on July 18, 1787, making it the first treaty to receive U.S. Senate ratification. The treaty represented the second time that Morocco and the United States affirmed diplomatic relations between the two countries. It is also worthy of mention that that Sultan, Mohammed III, was the first head of state, and Morocco the first country, to recognize the new United States as an independent country in 1777 Most importantly, the treaty provided for the protection of U.S. shipping vessels at a time when American merchant ships were at risk of harassment by various European warships.

## THE HONORABLE DISTRICT JUDGE RAMOS

17. The treaty specifically stated: If any Vessel belonging to the United States shall be in any of the Ports of His Majesty's Dominions, or within Gunshot of his Forts, she shall he protected as much as possible and no Vessel whatever belonging either to Moorish or Christian Powers with whom the United States may be at War, shall be permitted to follow or engage her, as we now deem the Citizens of America our good Friends. However, we the Moorish never consented to the Brand Labels Negro Black and Colored by the European psychologist of the Union Society of the 48 States. This Brand Label is the Trademark fraudulently written into legislation which laid the foundation for stolen legacy Birthright, heritage, culture and language of the Moors of America.

18. This process of false identification by fraudulent legislation has deprived the Moors of what rightfully belongs to Us economically, socially and politically. An example of such deprivation of right is noted in Legislative journal  Resolution 75 of 1933 Mr  Witkin Mr. Speaker, I desire at this time to call up resolution 75 , resolution  was read by the clerk as follows: in the house of Representative April 17th 1933 many Sons and Daughters of that proud and handsome race which inspired the architecture of Northern Africa and carried into Spain the influence of its artistic temperament  have become citizens of this nation establishing a genuine link outside of the 14th amendment. See H.R. 48 Congress man William Bingham.

19. It is clear from the corroborated Resolutions passed (resolution 75 & 1202) that under the terms of construction,  the language used to describe the manner and scope of which a party has become a citizen is clearly expressed.  A law that's publicly made attaches to a person place or thing it was made to attach to and, anything to the contrary not mentioned in the law shall not attach.

20. The statement made is true correct and complete to the best of my informed knowledge and as to those matters believed to be true under the penalty of perjury. Title 28 U.S.C. 1746

Messiah Ali Bey_____

THE HONORABLE DISTRICT JUDGE RAMOS

755 White Plaints Road apt 22 J

Bronx New York 10473

646 918-2215

## THE HONORABLE DISTRICT JUDGE RAMOS

Private Attorney General,  Messiah Ali Bey)         **Case No.  20 CV 5574**

**Plaintiff Memorandum of Law is Support**

In full Capacity, Standing & Status            )         **To Be Restored to the Calendar**

On the behalf of the Moorish Son's and         **)**         **and Amend the Plaintiffs Complaint**

Daughters of Light International institute,    )

Moorish American Society at Large              )

Conscious and un-conscious in the U.S.A.       )

With full legal Capacity, Standing & Status    )

*Plaintiff(s)*                                 )

-v-                                            )

DONALD J. TRUMP                                )

D.B.A. THE UNITED STATES                       )

&

THE ESTATE OF                                  )

ABRAHAM LINCOLN                                )

_____ *Defendant* _____ )

**MEMORANDUM IN SUPPORT**

1. QUESTION PRESENTED: WHETHER THE PLAINTIFF CLAIMS CAN SURVIVE A DISMISSAL BECAUSE OF PRESIDENTIAL IMMUNITY OR SOVEIGN IMMUNITY UNER THE TUCKER ACT?

YES!  The Tucker Act applies where claims for money damages against the United States founded either upon the United States Constitution  or any act of Congress or any regulation of an executive department or upon an express or implied contract with the United States 28 USC 1491, and because the plaintiff is demanding a money mandate  the District Court has jurisdiction. Plaintiff has a twofold Money Mandate issue Where one is the violation of an Article in the Peace and Friendship Treaty with the Empire of Morocco  and the United States 1787-1836 Art 16  of which the Article demands 100 Mexican dollars and relief is under 119 P.L. 109-8 April 20,2005 ( International Obligations of the United States), and the Other is under an Act of congress 13th amendment and the 20 sections  inclusive of Notice of Obligation from 38th congress first session bureau of the Freedman Act-Treasury Department April 12th 1864 (S. 443) and provision of HR 539,544&613 as stipulated by the 41 Congress. Courts will take judicial notice of Acts of Congress and Public Laws.

2. QUESTION PRESNTED: IF THE UNITED STATES ENSLAVED THE MOORS OF AMERICA WOULD THERE BE AN INFRINGED UPON THE ARTICLE OF THE TREATY OF PEACE AND FRIENDSHIP BETWEEN THE EMPIRE OF MOROCCO AND THE UNITED STATES 1787-1836?

YES! ARTICLE 16 state the Moors are not to be made slaves and here the provisions in the article demand monetary award of compensation reparation for the infringement on that article. ARTICLE 24 The Federal Court Will have jurisdiction for the infringement where a constitutional provision has been violated Pursuant to the Judiciary Act of 1789 Section 25 for the validity of a right set up in it.

THE HONORABLE DISTRICT JUDGE RAMOS

## MEMORANMDUM IN SUPPORT FOR THE RELIEF REQUESTED

**First Question Presented** Plaintiff argues the position cited in the Authority of Fisher v United States United States Court of Appeal for the Federal Circuit, march 9th 2005 02-5082  where this Court stated: "The Tucker Act itself does not create a substantive cause of action; **_in_** order to come within the jurisdictional reach and the waiver of the Tucker Act, a plaintiff must identify a separate **_source_** of substantive law that creates the right to money damages. _Mitchell II, 463 **U.S.** at 216_; _Testan, 424 **U.S.** at 398_. **_In_** the parlance of Tucker Act cases, that **_source_** must be "money-mandating." See _Mitchell II, 463 **U.S.** at 217_; _Testan, 424 **U.S.** at 398_.

Under the existing precedent of this court, the issue of whether a **_source_** is money-mandating is addressed **_in_** a two-step process. See _Gollehon Farming v. **United States**, 207 F.3d 1373, 1378-80 (Fed. Cir. 2000)_ (citing _Banks v. Garrett, 901 F.2d 1084, 1087-88 (Fed. Cir. 1990))_. As a first step, and for purposes of satisfying the jurisdictional requirement that a money-mandating **_statute_** or regulation is before the court, the plaintiff need only make a non-frivolous allegation that the **_statute_** or regulation may be interpreted as money-mandating. The non-frivolous allegation satisfies the jurisdictional requirement. If, as a second step, the issue of jurisdiction is later pressed and it is subsequently decided that the **_statute_** or regulation is not money-mandating, then the case is dismissed for failure to **_state_** a claim upon which relief can be granted. Plaintiff in error is aware that as stated in Harrison v United States for Dept of Agri Civil No. 99-44-B-H United District Court for the District of Maine that Not every claim invoking the United States Constitution, a federal statute, or a regulation is cognizable under the Tucker Act. The claim must be one for money damages against the United States and the claimant must demonstrate that the source of substantive law he relies upon can fairly be interpreted as mandating compensation by the federal government for the damages sustained., see Article 16 & 24 of the Treaty of Peace and Friendship with the Moroccan Empire and the United States 1787-1836

## THE HONORABLE DISTRICT JUDGE RAMOS

Moreover, authority in the fisher Court Fisher v United States United States Court of Appeals for the Federal Circuit 02-5082 satisfied two areas of immunity and the evidence fall within the statutory frame work of the Tuckers Act to trigger restoration back on the calendar, and such sited senate and House laws to that effect are presented for relief. The claims made here at this point are the events after the thru scientific methods of dehumanization process and the brand label was coined and phrased and saddled on the back of the Moors  as the 3 dead badges "Black Negro and Colored". While the other under the Treaty was before the violated that reduced the Moorish People with a Brand Label.

The Plaintiff in error claims this violation occurred in Article 16 of the Treaty where the substantive rights derives from and in its provision **"100 Mexican dollars"** here too it is unequivocally expressed where it states  In case a war between the Parties, the **Prisoners are not to be made Slaves**, it is unequivocally express  what was not to happen and not implied but to be exchanged one for another , **captain for Captain , officer for officer and one private man for another and if there shall prove a deficiency on either side , it shall be made up by the payment of one hundred Mexican dollars for each person wanting;  and it is agreed that all Prisoner shall be exchanged in twelve months from the time of them being taken,, and that their exchange maybe effected by a merchant or any other person**.

Our corroborated genuine link of the Moorish People nationality triggers a determination of the plaintiffs' claims pursuant to section 25 of the Judiciary Act of 1789 for the historical wrongs against the treaty of Peace that has over a 235 years being enforced in the United States.

In the case of Hauenstein v Lynham 100 U.S. 483,25 L. Ed 628,1879 LEXIS1841,Otto 483  the plaintiff in error is saying look at these case because it present no different situation where a treaty is involved than what is here, this  Plaintiff in error in this was a Swiss citizen and heirs of the deceased sought review of a judgment from the supreme court of appeals of the state court of Virginia that denied her

## THE HONORABLE DISTRICT JUDGE RAMOS

petition , the United States Supreme Court reversed the judgment and held that under a treaty between Swiss and United States plaintiff in error were entitled to the proceeds from  the sale and the fact that the Treaty did not set a statute of limitation on the sale did not nullify that provision and further stated;

Where a treaty admits of two constructions, one restrictive as to the rights, that may be claimed under it, and the other liberal, the latter is to be preferred.  Shanks v. Dupont, 3 Pet. 242. Such is the settled rule in this court. It was well remarked in the able opinion of the dissenting judge in the Court of Appeals, that if this case were to be decided under the treaty of 1847, there could not be a doubt as to the result.  In this we concur, and we think the case is equally clear under the treaty of 1850, which governs the rights of the parties.

The provision as to time in the earlier treaty is, in effect, a statute of limitation. It applied with Procrustean sameness in all the States and in all the cantons. In the latter treaty this limitation was dropped, and the time was to be such "as the laws of the State or canton will permit." In other words, it was left to the laws of the several States and cantons respectively to fix the limitation in this as in other cases.  This was consonant to the policy of out judiciary act of 1789, which gave to the State statutes of limitation the same effect in the local courts of the United States which they had in the courts of the States respectively that enacted them.  The Procrustean uniformity prescribed by the former treaty was thus abandoned, and it is fair to presume that the harmonious results in this respect which must necessarily follow, everywhere within the territory covered by the treaty, both at home and abroad, were the considerations by which those who made the change were animated.  If a State or canton had a law which imposed a limitation in this class of cases, nothing more was necessary.  If it had not such a law, it was competent to enact one, and until one exists there can be no bar arising from the lapse of time.  A party entitled can sue whenever he chooses to do so, and he is clothed with all the rights of any other litigant asserting a claim where there is no statute of limitation applicable to the case.  This we

## THE HONORABLE DISTRICT JUDGE RAMOS

understand to be the position of Virginia, and such are the legal consequences necessarily flowing from it.

This construction of the treaty derives support from the fact that the treaty provides (sixth article) that any controversy which may arise among the claimants to the succession, "shall be decided according to the laws and by the judges of the country where the property is situated."  Similar treaty provision are cited in Geofroy v Riggs 133 US 258 10 S. Ct 295,33 L Ed. 642; 1890 Lexis 1907  where in this case The nephews' mother, who was a sister of the deceased, died prior to the death of the deceased. The nephews sought a sale of the deceased's real property and a division of the proceeds among the parties according to their respective rights and interests. On appeal, the Court held that the nephews, being citizens of France, were entitled to take by inheritance an interest in the real estate in the District of Columbia of which their uncle, a citizen of the United States, died seized. The Court construed the Consular Convention, Feb. 23, 1853, U.S.-France, art. 7, 10 Stat. 996, to mean that in all political communities in the United States where legislation permitted aliens to hold real estate, the disability of Frenchmen from alienage in disposing and inheriting property, real and personal, was removed. This construction found support in § 1 of the Act of Congress of March 3d, 1887, 24 Stat. 476, which plainly implied that property in the District of Columbia could be acquired by aliens by inheritance.

The Court reversed the lower court's judgment and remanded the cause with directions to overrule the demurrer of the surviving siblings.

This Courts position was It is a general principle of construction with respect to treaties that they shall be liberally construed, so as to carry out the apparent intention of the parties to secure equality and reciprocity between them.  As they are contracts between independent nations, in their construction words are to be taken in their ordinary meaning, as understood in the public law of nations, and not in any artificial or special sense impressed upon them by local law, unless such restricted sense is clearly

intended.  And it has been held by this court that where a treaty admits of two constructions, one restrictive of rights that may be claimed under it and the other favorable to them, the latter is to be preferred.  *Hauenstein v. Lynham, 100 U.S. 483, 487*. The stipulation that the government of France in like manner accords to the citizens of the United States the same rights within its territory in respect to real and personal property and inheritance as are enjoyed there by its own citizens, indicates that that government considered that similar rights were extended to its citizens within the territory of the United States, whatever the designation given to their different political communities.

We are, therefore, of opinion that this is the meaning of the article in question --  that there shall be reciprocity in respect to the acquisition and inheritance of property in one country by the citizens of the other, that is, in all political communities in the United States where legislation permits aliens to hold real estate, the disability of Frenchmen from alienage in disposing and inheriting property, real and personal, is removed, and the same right, of disposition and inheritance of property, in France, is accorded to citizens of the United States, as are there enjoyed by its own citizens.

In the case of Morris v Lessee 32 U.S. 554; 8 Led. 781 (1833) The court stated; Historical facts of general and public notoriety, may indeed be proved by reputation; and that reputation may be established by historical works of known character and accuracy. But evidence of this sort is confined in a great measure to ancient facts which do not presuppose better evidence in existence.  And where from the nature of the transactions, or the remoteness of the period or the public and general reception of the facts, a just foundation is laid for general confidence. See 1 Starkie's Evidence pl. 1 sect 40 to 44,p 60 to 64;Starkie's Evid. Pl.2 sect. 55, p180-181.

 In the Moroccan Treaty of Peace we have similar language and terms of construction in its language and it is and fair to say that those similar rights are afforded Moors under the Most Favorite Nation clause Article 14 and Article 22 If an American Citizen shall die in our Country and no Will shall appear, the

Consul shall take possession of his effects and if there shall be no Consul, the Effects shall be deposited in the hands of some Person worthy of Trust, until the Party shall appear who has a right to demand them, but if the Heir to the person deceased be present, the Property shall be delivered to him without interruption; and if a Will shall appear, the Property shall descend agreeable to that Will, as soon as the Consul shall declare the Validity thereof. Here too in the Moroccan treaty there is no statute of limitation as well. It is clear that the terms of construction in the treaty inclusive of the genuine link of lineage, the violation in the Article 16 makes mandatory money payment on the United States Obligation, plaintiff has jump that hurdle and has reached over the bar concerning anything of a frivolous nature as state under FRCP 11  and 28 USC 1491. Unless there is evidence to the contrary.

**Second Question Presented:** IF THE UNITED STATES ENSLAVED THE MOORS OF AMERICA WOULD THERE BE AN INFRINGED UPON THE ARTICLE OF THE TREATY OF PEACE AND FRIENDSHIP BETWEEN THE EMPIRE OF MOROCCO AND THE UNITED STATES 1787-1836?

YES! ARTICLE 16 state the Moors are not to be made slaves and here the in the construction and plain language of the article that it was strictly forbidden under the provisions and terms of construction in the plain language of the article.  The monetary demand is within the terms of the treaty, 100 Mexican Dollars per man private therefore monetary award of compensation reparation for the infringement on that article is mandating. ARTICLE 24 allows for the provisions for The Federal Court to have jurisdiction for the infringement where a constitutional provision has been violated Pursuant to the Judiciary Act of 1789 Section 25. However, the plaintiff he is aware he must bring his claim within the provision of the Act for relief.

Instead of ascertaining by allowing the plaintiffs case to be served on the defendant the court sua sponta on its on motion determined that this claims of the Moroccan treaty, Title, Nationality and Rights invoked by the plaintiff is frivolous and whether the claims set up in the Treaty had any validity the Honorable

## THE HONORABLE DISTRICT JUDGE RAMOS

District Judge Ramos dismissed it as Frivolous in a arbitrary and capricious manner without the law in mind citing in what was construed a background of the case Nixon v Fitzgerald, 457 U.S. 749(1982) Consciousness v United States, Montero v Travis 171 F3d 757,760 (2nd Cir 1999), Neitzke v Williams 490 U.S. 319,327(1989))). For Presidential Immunity and Sovereign Immunity United States v Mitchell 445 U.S. 535,538(1980) quoting united States v Sherwood 312 U.S. 584,586(1941)FTCA 28USC1346,Neither case construes the 25th section of the Judiciary Act of 1789 for a determination of immunity under this Act.

It appears that the court is equating plaintiffs claims to a prisoner's case, in fact the court uses quite a few prison cases and 42 USC 1983 on sovereign immunity grounds.  The Plaintiffs claims are founded under on an infringement upon a right conferred in the Treaty of Peace and Friendship between the Empire of Morocco and the United States as a Moorish American and section 25 of the Judiciary Act of 1789 for review of its validity. However, the plaintiff is not a Prisoner and the title and source of authority for the claims raised pivots a Treaty of international weight and is not derivative of the 14th amendment moreover, it was a grave error in the manner this court equated a prisoner complaint with a breach and infringement of Treaty by  that dehumanized and manufactured  thru a forced human experiments and its' results with a medical claim of an inmate and I'm appalled at his level of jurisprudence and how this decision departed from settled law. The case belowis some of the background of the case that the Honorable Ramos cites concerning Leave to amend is not required  where it would be futile Curry v Curcione  Eight Amendment claims & PLRA

### BACKGROUND

I. Injury and Treatment

Hill alleges that, on March 28, 2007, while confined at the Jail, he "asked to be removed from Pod Two and placed in the block area after having been told that he would have to perform two particular cleaning details, three (3) days in a row by an officer Carissa Allen."[1] Shortly thereafter, according to Hill, "the Pod was ordered to lock in," and Curcione and Chawer approached his cell along with other officers and

## THE HONORABLE DISTRICT JUDGE RAMOS

ordered him to prepare to move. After putting on his sneakers, Hill was ordered to approach the cell door, turn around with his back to the door, get on his knees, and put his hands behind his head. The cell door then was opened and Hill was handcuffed. At that time, he alleges, he "was struck in the upper torso [and] head area several times by Officer Curcione." He was then led out of his cell into the Pod B sallyport,[2] where Curcione  [*119]  and Chawer slammed him against the wall several times. Hill says he then began to resist the officers to prevent being forced to the floor.

With his hands cuffed behind his head and with his torso and arms strapped in by an emergency response belt, Hill ultimately was thrown to the floor face down. He asserts that Curcione and Chawer then "beg[a]n to tighten the handcuffs [and] bind his wrist solely as a means to cause injury." He avers that he ceased resisting at this point. The officers then bent his legs across one another as Hill remained face down on the floor. At that point, Sergeant Williams, the Tour Supervisor, appeared on the scene. Curcione reported to Williams that Hill had been resistant and force was needed to subdue Hill. When Hill said that Curcione was lying and that the officers had assaulted him, Williams purportedly instructed Hill to "shut up."

Hill continued to complain that his handcuffs were too tight and alleges that the "Officers put a facemask on [him], causing his breathing to stop, while lifting him from the floor." He asserts that he then "was carried from Pod 2 sallyport, to the elevator, and then down to isolation." Placed in an empty cell with the handcuffs still on his wrists, Hill claims that he was not seen until the next afternoon by a nurse after complaining to an officer in the Segregation Unit. He was seen by a physician's assistant two days after the incident, complaining "that his hands were damaged by cuffs and [that he] suffered from extreme pain [and] numbness caused by nerve damage." An X-ray revealed a broken bone in Hill's wrist, and a cast was placed on the wrist on April 6, 2007, nine days after the injury occurred.

On April 19, 2007, Aikin, a Nurse Practitioner, confronted Hill with an officer's report that Hill had been working out doing push-ups and pull-ups during recreation. Aikin, who had provided Motrin pain medication for Hill, was told "that the officer's allegations were not exact and were an attempt to impede

---

## THE HONORABLE DISTRICT JUDGE RAMOS

[Hill's] endeavors in filing a law suit against [Aiken's] fellow colleagues in that [Hill] had informed him (Officer Tim Blackley) of [Hill's] intent to do such." Hill continued to complain of pain, asserting that Motrin was insufficient as pain medication and opined that he should have been "referred for a nerve conduction study.

The Honorable Ramos Court made a grave error to equate Plaintiffs complaint with the medical prison case here's why in Plaintiffs complaint is not comparable, it states: Between 1619 - 1865 Licensed by THE UNITED STATES, white Americans' (1) manufactured slaves through forced human experimentation using trade secrets to subject naturally occurring people of African descent to a scientific manufacturing method of "Dehumanization", (2) reduced their genetic situation and status from natural people to subhuman conditions, (3) reduced their legal status to real property and (4) trademarked and marketed them as "Slaves", "Negros", "Niggers" and "Blacks" as a method of commerce regarded as "American Slavery" and stole the Birthrights of the Moors of the Northern Shores of this Hemispheres who are the direct descendants of the Moroccan Empire and referred them as Negro Black and Colored.

The first difficulty interposed against this point is, that the plaintiffs in error in Curry do not in the record specify what parts of the constitution or **act** of Congress or Treaty they consider to have been overruled by the State court, nor in terms that any parts of either were so overruled therefore is not in harmony with the plaintiffs 25th section of the Judiciary Act, 100State at large 484 and 105 Stat at Large 487, Moroccan United States Treaty of Peace and Friendship 1787-1836.

**WHEREFORE Plaintiff Prays that the relief is requested to be restored and amend the complaint in the interest of justice and whatever the Court deems just and proper.**

*[signature]*

Aug 7 2020

# NATIONAL ARCHIVES AND RECORDS ADMINISTRATION

## To all to whom these presents shall come. Greeting:

By virtue of the authority vested in me by the Archivist of the United States, I certify on his behalf, under the seal of the National Archives of the United States, that the attached reproduction(s) is a true and correct copy of documents in his custody.

| SIGNATURE | |
|---|---|
| NAME<br>TREVOR K. PLANTE | DATE<br>10/29/15 |
| TITLE<br>CHIEF, ARCHIVES 1 REFERENCE SERVICES BRANCH | |
| NAME AND ADDRESS OF DEPOSITORY<br>The National Archives<br>Washington, D.C. 20408 | |

NA FORM 14007A (10-86)

[illegible] de for the common defence, promote the general Welfare, and secure the Blessings of Liberty to ourselves and our Posterity, [illegible] this Constitution for the United States of America.

Article. I.

Section. 1. All legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives.

Section. 2. The House of Representatives shall be composed of Members chosen every second Year by the People of the several States, and the Electors in each State shall have the Qualifications requisite for Electors of the most numerous Branch of the State Legislature.

No Person shall be a Representative who shall not have attained to the Age of twenty five Years, and been seven Years a Citizen of the United States, and who shall not, when elected, be an Inhabitant of that State in which he shall be chosen.

Representatives and direct Taxes shall be apportioned among the several States which may be included within this Union, according to their respective Numbers, which shall be determined by adding to the whole Number of free Persons, including those bound to Service for a Term of Years, and excluding Indians not taxed, three fifths of all other Persons. The actual Enumeration shall be made within three Years after the first Meeting of the Congress of the United States, and within every subsequent Term of ten Years, in such Manner as they shall by Law direct. The Number of Representatives shall not exceed one for every thirty Thousand, but each State shall have at Least one Representative; and until such enumeration shall be made, the State of New Hampshire shall be entitled to chuse three, Massachusetts eight, Rhode-Island and Providence Plantations one, Connecticut five, New-York six, New Jersey four, Pennsylvania eight, Delaware one, Maryland six, Virginia ten, North Carolina five, South Carolina five, and Georgia three.

When vacancies happen in the Representation from any State, the Executive Authority thereof shall issue Writs of Election to fill such Vacancies.

The House of Representatives shall chuse their Speaker and other Officers; and shall have the sole Power of Impeachment.

Section. 3. The Senate of the United States shall be composed of two Senators from each State, chosen by the Legislature thereof for six Years; and each Senator shall have one Vote.

Immediately after they shall be assembled in Consequence of the first Election, they shall be divided as equally as may be into three Classes. The Seats of the Senators of the first Class shall be vacated at the Expiration of the second Year, of the second Class at the Expiration of the fourth Year, and of the third Class at the Expiration of the sixth Year, so that one third may be chosen every second Year; and if Vacancies happen by Resignation, or otherwise, during the Recess of the Legislature of any State, the Executive thereof may make temporary Appointments until the next Meeting of the Legislature, which shall then fill such Vacancies.

No Person shall be a Senator who shall not have attained to the Age of thirty Years, and been nine Years a Citizen of the United States, and who shall not, when elected, be an Inhabitant of that State for which he shall be chosen.

The Vice President of the United States shall be President of the Senate, but shall have no Vote, unless they be equally divided.

The Senate shall chuse their other Officers, and also a President pro tempore, in the Absence of the Vice President, or when he shall exercise the Office of President of the United States.

The Senate shall have the sole Power to try all Impeachments. When sitting for that Purpose, they shall be on Oath or Affirmation. When the President of the United States is tried, the Chief Justice shall preside: And no Person shall be convicted without the Concurrence of two thirds of the Members present.

Judgment in Cases of Impeachment shall not extend further than to removal from Office, and disqualification to hold and enjoy any Office of honor, Trust or Profit under the United States: but the Party convicted shall nevertheless be liable and subject to Indictment, Trial, Judgment and Punishment, according to Law.

Section. 4. The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators.

The Congress shall assemble at least once in every Year, and such Meeting shall be on the first Monday in December, unless they shall by Law appoint a different Day.

Section. 5. Each House shall be the Judge of the Elections, Returns and Qualifications of its own Members, and a Majority of each shall constitute a Quorum to do Business; but a smaller Number may adjourn from day to day, and may be authorized to compel the Attendance of absent Members, in

# We the People

of the United States, in Order to form a more perfect Union, establish Justice, insure domestic Tranquility, provide for the common defence, promote the general Welfare, and secure the Blessings of Liberty to ourselves and our Posterity, do ordain and establish this Constitution for the United States of America.

## Article. I.

Section. 1. All legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives.

Section. 2. The House of Representatives shall be composed of Members chosen every second Year by the People of the several States, and the Electors in each State shall have the Qualifications requisite for Electors of the most numerous Branch of the State Legislature.

No Person shall be a Representative who shall not have attained to the Age of twenty five Years, and been seven Years a Citizen of the United States, and who shall not, when elected, be an Inhabitant of that State in which he shall be chosen.

Representatives and direct Taxes shall be apportioned among the several States which may be included within this Union, according to their respective Numbers, which shall be determined by adding to the whole Number of free Persons, including those bound to Service for a Term of Years, and excluding Indians not taxed, three fifths of all other Persons. The actual Enumeration shall be made within three Years after the first Meeting of the Congress of the United States, and within every subsequent Term of ten Years, in such Manner as they shall by Law direct. The Number of Representatives shall not exceed one for every thirty Thousand, but each State shall have at Least one Representative; and until such enumeration shall be made, the State of New Hampshire shall be entitled to chuse three, Massachusetts eight, Rhode Island and Providence Plantations one, Connecticut five, New York six, New Jersey four, Pennsylvania eight, Delaware one, Maryland six, Virginia ten, North Carolina five, South Carolina five, and Georgia three.

When vacancies happen in the Representation from any State, the Executive Authority thereof shall issue Writs of Election to fill such Vacancies.

The House of Representatives shall chuse their Speaker and other Officers; and shall have the sole Power of Impeachment.

Section. 3. The Senate of the United States shall be composed of two Senators from each State, chosen by the Legislature thereof, for six Years; and each Senator shall have one Vote.

Immediately after they shall be assembled in Consequence of the first Election, they shall be divided as equally as may be into three Classes. The Seats of the Senators of the first Class shall be vacated at the Expiration of the second Year, of the second Class at the Expiration of the fourth Year, and of the third Class at the Expiration of the sixth Year, so that one third may be chosen every second Year; and if Vacancies happen by Resignation, or otherwise, during the Recess of the Legislature of any State, the Executive thereof may make temporary Appointments until the next Meeting of the Legislature, which shall then fill such Vacancies.

No Person shall be a Senator who shall not have attained to the Age of thirty Years, and been nine Years a Citizen of the United States, and who shall not, when elected, be an Inhabitant of that State for which he shall be chosen.

The Vice President of the United States shall be President of the Senate, but shall have no Vote, unless they be equally divided.

The Senate shall chuse their other Officers, and also a President pro tempore, in the Absence of the Vice President, or when he shall exercise the Office of President of the United States.

The Senate shall have the sole Power to try all Impeachments. When sitting for that Purpose, they shall be on Oath or Affirmation. When the President of the United States is tried, the Chief Justice shall preside: And no Person shall be convicted without the Concurrence of two thirds of the Members present.

Judgment in Cases of Impeachment shall not extend further than to removal from Office, and disqualification to hold and enjoy any Office of honor, Trust or Profit under the United States: but the Party convicted shall nevertheless be liable and subject to Indictment, Trial, Judgment and Punishment, according to Law.

Section. 4. The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators.

The Congress shall assemble at least once in every Year, and such Meeting shall be on the first Monday in December, unless they shall by Law appoint a different Day.

Section. 5. Each House shall be the Judge of the Elections, Returns and Qualifications of its own Members, and a Majority of each shall constitute a Quorum to do Business; but a smaller Number may adjourn from day to day, and may be authorized to compel the Attendance of absent Members, in such Manner, and under such Penalties as each House may provide.

Each House may determine the Rules of its Proceedings, punish its Members for disorderly Behaviour, and, with the Concurrence of two thirds, expel a Member.

Each House shall keep a Journal of its Proceedings, and from time to time publish the same, excepting such Parts as may in their Judgment require Secrecy; and the Yeas and Nays of the Members of either House on any question shall, at the Desire of one fifth of those Present, be entered on the Journal.

Neither House, during the Session of Congress, shall, without the Consent of the other, adjourn for more than three days, nor to any other Place than that in which the two Houses shall be sitting.

Section. 6. The Senators and Representatives shall receive a Compensation for their Services, to be ascertained by Law, and paid out of the Treasury of the United States. They shall in all Cases, except Treason, Felony and Breach of the Peace, be privileged from Arrest during their Attendance at the Session of their respective Houses, and in going to and returning from the same; and for any Speech or Debate in either House, they shall not be questioned in any other Place.

No Senator or Representative shall, during the Time for which he was elected, be appointed to any civil Office under the Authority of the United States, which shall have been created, or the Emoluments whereof shall have been encreased during such time; and no Person holding any Office under the United States, shall be a Member of either House during his Continuance in Office.

Section. 7. All Bills for raising Revenue shall originate in the House of Representatives; but the Senate may propose or concur with Amendments as on other Bills.

Every Bill which shall have passed the House of Representatives and the Senate, shall, before it become a Law, be presented to the President of the



United States; If he approve he shall sign it, but if not he shall return it, with his Objections to that House in which it shall have originated, who shall enter the Objections at large on their Journal, and proceed to reconsider it. If after such Reconsideration two thirds of that House shall agree to pass the Bill, it shall be sent, together with the Objections, to the other House, by which it shall likewise be reconsidered, and if approved by two thirds of that House, it shall become a Law. But in all such Cases the Votes of both Houses shall be determined by yeas and Nays, and the Names of the Persons voting for and against the Bill shall be entered on the Journal of each House respectively. If any Bill shall not be returned by the President within ten Days (Sundays excepted) after it shall have been presented to him, the Same shall be a Law in like Manner as if he had signed it, unless the Congress by their Adjournment prevent its Return, in which Case it shall not be a Law.

Every Order, Resolution, or Vote to which the Concurrence of the Senate and House of Representatives may be necessary (except on a question of Adjournment) shall be presented to the President of the United States; and before the Same shall take Effect, shall be approved by him, or being disapproved by him, shall be repassed by two thirds of the Senate and House of Representatives, according to the Rules and Limitations prescribed in the Case of a Bill.

Section. 8. The Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States; but all Duties, Imposts and Excises shall be uniform throughout the United States;

To borrow Money on the credit of the United States;

To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes;

To establish an uniform Rule of Naturalization, and uniform Laws on the subject of Bankruptcies throughout the United States;

To coin Money, regulate the Value thereof, and of foreign Coin, and fix the Standard of Weights and Measures;

To provide for the Punishment of counterfeiting the Securities and current Coin of the United States;

To establish Post Offices and post Roads;

To promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries;

To constitute Tribunals inferior to the supreme Court;

To define and punish Piracies and Felonies committed on the high Seas, and Offences against the Law of Nations;

To declare War, grant Letters of Marque and Reprisal, and make Rules concerning Captures on Land and Water;

To raise and support Armies, but no Appropriation of Money to that Use shall be for a longer Term than two Years;

To provide and maintain a Navy;

To make Rules for the Government and Regulation of the land and naval Forces;

To provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions;

To provide for organizing, arming, and disciplining, the Militia, and for governing such Part of them as may be employed in the Service of the United States, reserving to the States respectively, the Appointment of the Officers, and the Authority of training the Militia according to the discipline prescribed by Congress;

To exercise exclusive Legislation in all Cases whatsoever, over such District (not exceeding ten Miles square) as may, by Cession of particular States, and the Acceptance of Congress, become the Seat of the Government of the United States, and to exercise like Authority over all Places purchased by the Consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings;—And

To make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof.

Section. 9. The Migration or Importation of such Persons as any of the States now existing shall think proper to admit, shall not be prohibited by the Congress prior to the Year one thousand eight hundred and eight, but a Tax or duty may be imposed on such Importation, not exceeding ten dollars for each Person.

The Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it.

No Bill of Attainder or ex post facto Law shall be passed.

No Capitation, or other direct, Tax shall be laid, unless in Proportion to the Census or Enumeration herein before directed to be taken.

No Tax or Duty shall be laid on Articles exported from any State.

No Preference shall be given by any Regulation of Commerce or Revenue to the Ports of one State over those of another: nor shall Vessels bound to, or from, one State, be obliged to enter, clear, or pay Duties in another.

No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law; and a regular Statement and Account of the Receipts and Expenditures of all public Money shall be published from time to time.

No Title of Nobility shall be granted by the United States: And no Person holding any Office of Profit or Trust under them, shall, without the Consent of the Congress, accept of any present, Emolument, Office, or Title, of any kind whatever, from any King, Prince, or foreign State.

Section. 10. No State shall enter into any Treaty, Alliance, or Confederation; grant Letters of Marque and Reprisal; coin Money; emit Bills of Credit; make any Thing but gold and silver Coin a Tender in Payment of Debts; pass any Bill of Attainder, ex post facto Law, or Law impairing the Obligation of Contracts, or grant any Title of Nobility.

No State shall, without the Consent of the Congress, lay any Imposts or Duties on Imports or Exports, except what may be absolutely necessary for executing its inspection Laws: and the net Produce of all Duties and Imposts, laid by any State on Imports or Exports, shall be for the Use of the Treasury of the United States; and all such Laws shall be subject to the Revision and Control of the Congress.

No State shall, without the Consent of Congress, lay any Duty of Tonnage, keep Troops, or Ships of War in time of Peace, enter into any Agreement or Compact with another State, or with a foreign Power, or engage in War, unless actually invaded, or in such imminent Danger as will not admit of delay.

# Article. II.

Section. 1. The executive Power shall be vested in a President of the United States of America. He shall hold his Office during the Term of four Years, and, together with the Vice President, chosen for the same Term, be elected, as follows:

Each State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors, equal to the whole Number of Senators and Representatives to which the State may be entitled in the Congress: but no Senator or Representative, or Person holding an Office of Trust or Profit under the United States, shall be appointed an Elector.

The Electors shall meet in their respective States, and vote by Ballot for two Persons, of whom one at least shall not be an Inhabitant of

the same State with themselves. And they shall make a List of all the Persons voted for, and of the Number of Votes for each; which List they shall sign and certify, and transmit sealed to the Seat of the Government of the United States, directed to the President of the Senate. The President of the Senate shall, in the Presence of the Senate and House of Representatives, open all the Certificates, and the Votes shall then be counted. The Person having the greatest Number of Votes shall be the President, if such Number be a Majority of the whole Number of Electors appointed; and if there be more than one who have such Majority, and have an equal Number of Votes, then the House of Representatives shall immediately chuse by Ballot one of them for President; and if no Person have a Majority, then from the five highest on the List the said House shall in like Manner chuse the President. But in chusing the President, the Votes shall be taken by States, the Representation from each State having one Vote; A quorum for this Purpose shall consist of a Member or Members from two thirds of the States, and a Majority of all the States shall be necessary to a Choice. In every Case, after the Choice of the President, the Person having the greatest Number of Votes of the Electors shall be the Vice President. But if there should remain two or more who have equal Votes, the Senate shall chuse from them by Ballot the Vice President.

The Congress may determine the Time of chusing the Electors, and the Day on which they shall give their Votes; which Day shall be the same throughout the United States.

No Person except a natural born Citizen, or a Citizen of the United States, at the time of the Adoption of this Constitution, shall be eligible to the Office of President; neither shall any Person be eligible to that Office who shall not have attained to the Age of thirty five Years, and been fourteen Years a Resident within the United States.

In Case of the Removal of the President from Office, or of his Death, Resignation, or Inability to discharge the Powers and Duties of the said Office, the Same shall devolve on the Vice President, and the Congress may by Law provide for the Case of Removal, Death, Resignation or Inability, both of the President and Vice President, declaring what Officer shall then act as President, and such Officer shall act accordingly, until the Disability be removed, or a President shall be elected.

The President shall, at stated Times, receive for his Services, a Compensation, which shall neither be encreased nor diminished during the Period for which he shall have been elected, and he shall not receive within that Period any other Emolument from the United States, or any of them.

Before he enter on the Execution of his Office, he shall take the following Oath or Affirmation:—"I do solemnly swear (or affirm) that I will faithfully execute the Office of President of the United States, and will to the best of my Ability, preserve, protect and defend the Constitution of the United States."

Section. 2. The President shall be Commander in Chief of the Army and Navy of the United States, and of the Militia of the several States, when called into the actual Service of the United States; he may require the Opinion, in writing, of the principal Officer in each of the executive Departments, upon any Subject relating to the Duties of their respective Offices, and he shall have Power to grant Reprieves and Pardons for Offences against the United States, except in Cases of Impeachment.

He shall have Power, by and with the Advice and Consent of the Senate, to make Treaties, provided two thirds of the Senators present concur; and he shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

The President shall have Power to fill up all Vacancies that may happen during the Recess of the Senate, by granting Commissions which shall expire at the End of their next Session.

Section. 3. He shall from time to time give to the Congress Information of the State of the Union, and recommend to their Consideration such Measures as he shall judge necessary and expedient; he may, on extraordinary Occasions, convene both Houses, or either of them, and in Case of Disagreement between them, with Respect to the Time of Adjournment, he may adjourn them to such Time as he shall think proper; he shall receive Ambassadors and other public Ministers; he shall take Care that the Laws be faithfully executed, and shall Commission all the Officers of the United States.

Section. 4. The President, Vice President and all civil Officers of the United States, shall be removed from Office on Impeachment for, and Conviction of, Treason, Bribery, or other high Crimes and Misdemeanors.

# Article III.

Section. 1. The judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish. The Judges, both of the supreme and inferior Courts, shall hold their Offices during good Behaviour, and shall, at stated Times, receive for their Services, a Compensation, which shall not be diminished during their Continuance in Office.

Section. 2. The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority;—to all Cases affecting Ambassadors, other public Ministers and Consuls;—to all Cases of admiralty and maritime Jurisdiction;—to Controversies to which the United States shall be a Party;—to Controversies between two or more States;—between a State and Citizens of another State;—between Citizens of different States,—between Citizens of the same State claiming Lands under Grants of different States, and between a State, or the Citizens thereof, and foreign States, Citizens or Subjects.

In all Cases affecting Ambassadors, other public Ministers and Consuls, and those in which a State shall be Party, the supreme Court shall have original Jurisdiction. In all the other Cases before mentioned, the supreme Court shall have appellate Jurisdiction, both as to Law and Fact, with such Exceptions, and under such Regulations as the Congress shall make.

The Trial of all Crimes, except in Cases of Impeachment, shall be by Jury; and such Trial shall be held in the State where the said Crimes shall have been committed; but when not committed within any State, the Trial shall be at such Place or Places as the Congress may by Law have directed.

Section. 3. Treason against the United States, shall consist only in levying War against them, or in adhering to their Enemies, giving them Aid and Comfort. No Person shall be convicted of Treason unless on the Testimony of two Witnesses to the same overt Act, or on Confession in open Court.

The Congress shall have Power to declare the Punishment of Treason, but no Attainder of Treason shall work Corruption of Blood, or Forfeiture except during the Life of the Person attainted.

# Article IV.

Section. 1. Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State.

United States Department of State

# Treaties in Force

## A List of Treaties and Other International Agreements of the United States in Force on January 1, 2012



*U.S. Courts Library*
*U.S. Courthouse – Room 313 S*
*225 Cadman Plaza East*
*Brooklyn, NY 11201*

**United States Department of State**



# Treaties in Force

## A List of Treaties and Other International Agreements of the United States in Force on January 1, 2012



Air transport agreement, with annexes.
*Signed at Rabat October 10, 2001.*
*Entered into force August 19, 2002.*
TIAS 13165.

## COMMERCE
*See PEACE TREATIES*

## CONSULS
*See PEACE TREATIES*

## CULTURAL RELATIONS

Cultural agreement.
*Signed at Washington February 10, 1967.*
*Entered into force February 10, 1967.*
18 UST 174; TIAS 6215; 688 UNTS 149.

## DEFENSE

Agreement concerning the use of certain facilities in Morocco by the United States.
*Exchange of notes at Washington May 27, 1982.*
*Entered into force May 27, 1982.*
34 UST 1127; TIAS 10399; 1566 UNTS 139.

Agreement regarding grants under the Foreign Assistance Act of 1961, as amended, or successor legislation, and the furnishing of defense articles, defense services and related training, including pursuant to the United States International Military Education and Training (IMET) Program.
*Exchange of notes at Rabat July 21 and November 24, 2006.*
*Entered into force November 24, 2006.*
NP

## ECONOMIC AND TECHNICAL COOPERATION

Agreement providing for economic, technical, and related assistance.
*Exchange of notes at Rabat April 2, 1957.*
*Entered into force April 2, 1957.*
8 UST 459; TIAS 3799; 288 UNTS 157.

Amendment
May 19, 1958 (9 UST 923; TIAS 4054; 317 UNTS 354).

Millennium Challenge Compact, with annexes.
*Signed at Washington August 31, 2007.*
*Entered into force September 15, 2008.*
TIAS

Agency for International Development
November 7, 1975 (28 UST 57; TIAS 8464).
June 14, 1976 (28 UST 1479; TIAS 8518).

## EDUCATION

Agreement establishing a Binational Commission for Educational and Cultural Exchange.
*Signed at Marrakech February 12, 1982.*
*Entered into force May 20, 1982.*
TIAS 10407; 34 UST 1180.

## EMPLOYMENT

Agreement relating to the employment of dependents of official government employees.
*Exchange of notes at Rabat February 27 and April 2, 1992.*
*Entered into force April 2, 1992.*
TIAS

## ENVIRONMENTAL COOPERATION

Agreement for cooperation in the Global Learning and Observations to Benefit the Environment (GLOBE) Program, with appendices.
*Signed at Rabat March 27, 1996.*
*Entered into force March 27, 1996.*
TIAS 12739.

## FINANCE

Agreement regarding the consolidation and rescheduling of certain debts owed to, guaranteed by or insured by the United States Government and its agencies, with annexes.
*Signed at Rabat December 30, 1983.*
*Entered into force February 10, 1984.*
TIAS 11015; 2022 UNTS 73.

Agreement regarding the consolidation and rescheduling of certain debts owed to, guaranteed by or insured by the United States Government and its agencies, with annexes.
*Signed at Rabat December 23, 1985, and February 13, 1986.*
*Entered into force January 21, 1986.*
NP

Agreement regarding the consolidation and rescheduling of certain debts owed to, guaranteed by, or insured by the United States Government and its agencies, with annexes.
*Signed at Rabat March 1, 1988.*
*Entered into force April 11, 1988.*
NP

Agreement regarding the consolidation and rescheduling of certain debts owed to, guaranteed by, or insured by the United States Government and its agencies, with annexes.
*Signed at Rabat August 21, 1989.*
*Entered into force September 25, 1989.*
NP

Agreement regarding the consolidation and rescheduling or refinancing of certain debts owed to, guaranteed by, or insured by the United States Government and its agencies, with annexes.
*Signed at Rabat February 14, 1991.*
*Entered into force March 29, 1991.*
NP

Agreement regarding the consolidation and rescheduling or refinancing of certain debts owed to, guaranteed by, or insured by the United States Government and its agencies, with annexes.
*Signed at Rabat August 24, 1992.*
*Entered into force October 12, 1992.*
NP

Investment incentive agreement.
*Signed at Washington March 15, 1995.*
*Entered into force September 22, 1999.*
TIAS

## INTERNATIONAL CRIMINAL COURT

Agreement regarding the surrender of persons to the International Criminal Court.
*Signed at New York September 24, 2003.*
*Entered into force November 19, 2003.*
TIAS 03-1119.

## INVESTMENT

Treaty concerning the encouragement and reciprocal protection of investments, with protocol.
*Signed at Washington July 22, 1985.*
*Entered into force May 29, 1991.*
TIAS

## JUDICIAL ASSISTANCE

Convention on mutual assistance in criminal matters.
*Signed at Rabat October 17, 1983.*
*Entered into force June 23, 1993.*
TIAS

## MAPPING

Agreement concerning mapping, charting and geodesy cooperation.
*Signed at Rabat April 29, 1982.*
*Entered into force April 29, 1982.*
34 UST 987; TIAS 10386.

Memorandum of agreement concerning hydrographic surveys and nautical charting.
*Signed at Rabat November 20, 1985.*
*Entered into force November 20, 1985.*
TIAS 11210.

## NARCOTIC DRUGS

Agreement regarding joint cooperation in fighting against international terrorism, organized crime, and the illicit production, trafficking and abuse of narcotics.
*Signed at Rabat February 10, 1989.*
*Entered into force February 10, 1989.*
TIAS 12029.

## PEACE CORPS

Agreement relating to the establishment of a Peace Corps program in Morocco.
*Exchange of notes at Rabat February 8 and 9, 1963.*
*Entered into force February 9, 1963.*
23 UST 209; TIAS 7297.

Amendment
March 10, 1972 (23 UST 209; TIAS 7297).

## PEACE TREATIES

Treaty of peace.*
*Signed at Meccanez September 16, 1836.*
*Entered into force January 28, 1837.*
8 Stat. 484; TS 244-2; 9 Bevans 1286.

Note
* Extraterritorial jurisdiction in Morocco relinquished by the United States October 6, 1956.

## POSTAL MATTERS

International express mail agreement, with detailed regulations.
*Signed at Rabat and Washington March 18 and May 11, 1988.*
*Entered into force June 1, 1988.*
TIAS 11588.

## SEISMIC OBSERVATIONS

Agreement regarding the development and operation of a seismic monitoring station in the Kingdom of Morocco.
*Signed at Rabat December 31, 2008.*
*Entered into force December 31, 2008.*
TIAS 08-1231.



## LIBRARY OF CONGRESS

Office of Business Enterprises
Duplication Services Section

THIS IS TO CERTIFY that the collections of the Library of Congress contain a publication entitled **THE PUBLIC STATUTES AT LARGE OF THE UNITED STATES OF AMERICA,** and that the attached photocopies from Volume VIII – the title page and pages 100 through 105 on which appears the TREATY OF PEACE AND FRIENDSHIP *Between the United States of America, and His Imperial Majesty the Emperor of Morocco* – are a true representation from that work.

IN WITNESS WHEREOF, the seal of the Library of Congress is affixed hereto on October 26, 2012.

_____
Gregory T. Cooper
Duplication Services, Section Head
Office of Business Enterprises
Library of Congress

101 Independence Avenue, SE Washington, DC 20540–4917 Tel 202.707.5650 www.loc.gov; duplicationservices@loc.gov

## BY AUTHORITY OF CONGRESS.

THE

# Public Statutes at Large

OF THE

# UNITED STATES OF AMERICA,

FROM THE

### ORGANIZATION OF THE GOVERNMENT IN 1789, TO MARCH 3, 1845.

#### ARRANGED IN CHRONOLOGICAL ORDER.

WITH

### REFERENCES TO THE MATTER OF EACH ACT AND TO THE SUBSEQUENT ACTS ON THE SAME SUBJECT,

AND

## COPIOUS NOTES OF THE DECISIONS

OF THE

# Courts of the United States

### CONSTRUING THOSE ACTS, AND UPON THE SUBJECTS OF THE LAWS.

WITH AN

#### INDEX TO THE CONTENTS OF EACH VOLUME,

AND A

### FULL GENERAL INDEX TO THE WHOLE WORK, IN THE CONCLUDING VOLUME.

TOGETHER WITH

### The Declaration of Independence, the Articles of Confederation, and the Constitution of the United States;

AND ALSO,

#### TABLES, IN THE LAST VOLUME, CONTAINING LISTS OF THE ACTS RELATING TO THE JUDICIARY, IMPOSTS AND TONNAGE, THE PUBLIC LANDS, ETC.

EDITED BY

# RICHARD PETERS, ESQ.,

COUNSELLOR AT LAW.

The rights and interest of the United States in the stereotype plates from which this work is printed, are hereby recognised, acknowledged, and declared by the publishers, according to the provisions of the joint resolution of Congress, passed March 3, 1845.

## VOL. VIII.

BOSTON:

## CHARLES C. LITTLE AND JAMES BROWN

### 1846.

# TREATY WITH MOROCCO. (a)

Sept. 16, 1836.

Proclamation
of the President
of the U. S.,
Jan. 30, 1837.

In the name of God, the merciful and clement!



Emperor's seal

Abd
Errahman
Ibenu Kesham,
whom God
exalt!

PRAISE BE TO GOD!

This is the copy of the Treaty of Peace which we have made with the Americans and written in this book; affixing thereto our blessed seal, that, with the help of God, it may remain firm forever.

Written at Meccanez, the city of Olives, on the 3d day of the month Jumad el lahhar, in the year of the Hegira 1252. (Corresponding to Sept. 16. A. D. 1836.)

**Mutual agreement of the parties to the treaty.** ART. 1. We declare that both parties have agreed that this treaty, consisting of twenty-five articles, shall be inserted in this book, and delivered to James R. Leib, agent of the United States, and now their resident consul at Tangier, with whose approbation it has been made, and who is duly authorized on their part, to treat with us, concerning all the matters contained therein.

**Neither party to take commissions from an enemy.** ART. 2. If either of the parties shall be at war with any nation whatever, the other shall not take a commission from the enemy, nor fight under their colors.

**Persons, &c. of one party, captured in an enemy's vessel, to be released.** ART. 3. If either of the parties shall be at war with any nation whatever, and take a prize belonging to that nation, and there shall be found on board subjects or effects belonging to either of the parties, the subjects shall be set at liberty, and the effects returned to the owners. And if any goods, belonging to any nation, with whom either of the parties shall be at war, shall be loaded on vessels belonging to the other party, they shall pass free and unmolested, without any attempt being made to take or detain them.

**Vessels to have passports.** ART. 4. A signal, or pass, shall be given to all vessels belonging to both parties, by which they are to be known when they meet at sea; and if the commander of a ship of war of either party shall have other ships under his convoy, the declaration of the commander shall alone be sufficient to exempt any of them from examination.

**Visit of vessels at sea.** ART. 5. If either of the parties shall be at war, and shall meet a vessel at sea belonging to the other, it is agreed, that if an examination is to be made, it shall be done by sending a boat with two or three men only: and if any gun shall be fired, and injury done, without reason, the offending party shall make good all damages.

**American citizens and effects to be restored.** ART. 6. If any Moor shall bring citizens of the United States, or their effects, to his Majesty, the citizens shall immediately be set at liberty, and the effects restored; and, in like manner, if any Moor, not a subject of these dominions, shall make prize of any of the citizens

---

(a) For the treaty with Morocco of January 1787, see ante, page 100.

## TREATY WITH MOROCCO. 1836.

of America or their effects, and bring them into any of the ports of his Majesty, they shall be immediately released, as they will then be considered as under his Majesty's protection.

ART. 7. If any vessel of either party, shall put into a port of the other, and have occasion for provisions or other supplies, they shall be furnished without any interruption or molestation.

*Vessels in port to be supplied.*

ART. 8. If any vessel of the United States, shall meet with a disaster at sea, and put into one of our ports to repair, she shall be at liberty to land and reload her cargo, without paying any duty whatever.

*No duty in case of vessels putting in to repair.*

ART. 9. If any vessel of the United States, shall be cast on shore on any part of our coasts, she shall remain at the disposition of the owners, and no one shall attempt going near her without their approbation, as she is then considered particularly under our protection; and if any vessel of the United States shall be forced to put into our ports by stress of weather, or otherwise, she shall not be compelled to land her cargo, but shall remain in tranquillity until the commander shall think proper to proceed on his voyage.

*Stranded vessels to be protected.*

ART. 10. If any vessel of either of the parties shall have an engagement with a vessel belonging to any of the Christian Powers, within gun-shot of the forts of the other, the vessel so engaged, shall be defended and protected as much as possible, until she is in safety: and if any American vessel shall be cast on shore, on the coast of Wadnoon, or any coast thereabout, the people belonging to her, shall be protected and assisted, until by the help of God, they shall be sent to their country.

*Vessels engaged within gunshot of forts to be protected.*

ART. 11. If we shall be at war with any Christian Power, and any of our vessels sails from the ports of the United States, no vessel belonging to the enemy shall follow, until twenty-four hours after the departure of our vessels: and the same regulations shall be observed towards the American vessels sailing from our ports, be their enemies Moors or Christians.

*Enemy's vessels not allowed to follow for 24 hours.*

ART. 12. If any ship of war belonging to the United States, shall put into any of our ports, she shall not be examined on any pretence whatever, even though she should have fugitive slaves on board, nor shall the governor or commander of the place compel them to be brought on shore on any pretext, nor require any payment for them.

*Ships of war not to be examined in port.*

ART. 13. If a ship of war of either party shall put into a port of the other, and salute, it shall be returned from the fort with an equal number of guns, not more or less.

*Salutes to be returned.*

ART. 14. The commerce with the United States, shall be on the same footing as is the commerce with Spain, or as that with the most favored nation for the time being; and their citizens shall be respected and esteemed, and have full liberty to pass and repass our country and seaports whenever they please, without interruption.

*American commerce on the most favored footing.*

ART. 15. Merchants of both countries shall employ only such interpreters, and such other persons to assist them in their business, as they shall think proper. No commander of a vessel shall transport his cargo on board another vessel; he shall not be detained in port longer than he may think proper; and all persons employed in loading or unloading goods, or in any other labor whatever, shall be paid at the customary rates, not more and not less.

*Employment of interpreters, &c.*

ART. 16. In case of a war between the parties, the prisoners are not to be made slaves, but to be exchanged one for another, captain for captain, officer for officer, and one private man for another; and if there

*Exchange of prisoners.*

Case 1:20-cv-05574-ER Document 86-6 Filed 11/11/20 Page 36 of 60

shall prove a deficiency on either side, it shall be made up by the payment of one hundred Mexican dollars for each person wanting. And it is agreed, that all prisoners shall be exchanged in twelve months from the time of their being taken, and that this exchange may be effected by a merchant, or any other person, authorized by either of the parties.

**ART. 17.** Merchants shall not be compelled to buy or sell any kind of goods but such as they shall think proper: and may buy and sell all sorts of merchandise but such as are prohibited to the other Christian nations.

No compulsion in buying or selling.

**ART. 18.** All goods shall be weighed and examined before they are sent on board; and to avoid all detention of vessels, no examination shall afterwards be made, unless it shall first be proved that contraband goods have been sent on board; in which case, the persons who took the contraband goods on board, shall be punished according to the usage and custom of the country, and no other person whatever shall be injured, nor shall the ship or cargo incur any penalty or damage whatever.

No examination of goods on board, except, &c.

**ART. 19.** No vessel shall be detained in port on any pretence whatever, nor be obliged to take on board any article without the consent of the commander, who shall be at full liberty to agree for the freight of any goods he takes on board.

No detention of vessels.

**ART. 20.** If any of the citizens of the United States, or any persons under their protection, shall have any dispute with each other, the consul shall decide between the parties; and whenever the consul shall require any aid, or assistance from our Government, to enforce his decisions, it shall be immediately granted to him.

Disputes between Americans, &c. to be decided by the consul, &c.

**ART. 21.** If a citizen of the United States should kill or wound a Moor, or, on the contrary, if a Moor shall kill or wound a citizen of the United States, the law of the country shall take place, and equal justice shall be rendered, the consul assisting at the trial; and if any delinquent shall make his escape, the consul shall not be answerable for him in any manner whatever.

Killing, &c. punishable by the law of the country.

**ART. 22.** If an American citizen shall die in our country, and no will shall appear, the consul shall take possession of his effects; and if there shall be no consul, the effects shall be deposited in the hands of some person worthy of trust, until the party shall appear who has a right to demand them; but if the heir to the person deceased be present, the property shall be delivered to him without interruption; and if a will shall appear the property shall descend agreeably to that will, as soon as the consul shall declare the validity thereof.

Persons dying intestate; care of their effects.

**ART. 23.** The consul of the United States of America, shall reside in any seaport of our dominions that they shall think proper; and they shall be respected, and enjoy all the privileges which the consuls of any other nation enjoy: and if any of the citizens of the United States shall contract any debts or engagements, the consul shall not be in any manner accountable for them, unless he shall have given a promise in writing for the payment or fulfilling thereof; without which promise in writing, no application to him for any redress shall be made.

Residence of consul. [It is generally at Tangier.]

**ART. 24.** If any differences shall arise by either party infringing on any of the articles of this treaty, peace and harmony shall remain notwithstanding, in the fullest force, until a friendly application shall be made for an arrangement; and until that application shall be rejected, no appeal shall be made to arms. And if a war shall break out between the parties, nine months shall be granted to all the subjects of both parties, to dispose of their effects and retire with their property. And

No appeal to arms until refusal of friendly arrangement.

it is further declared, that whatever indulgence, in trade or otherwise, *In case of war, nine months allowed to settle affairs, &c.*
shall be granted to any of the Christian Powers, the citizens of the
United States shall be equally entitled to them.

ART. 25. This treaty shall continue in force, with the help of God, *Treaty to last fifty years, &c.*
for fifty years; after the expiration of which term, the treaty shall con-
tinue to be binding on both parties, until the one shall give twelve
months' notice to the other, of an intention to abandon it; in which
case, its operations shall cease at the end of the twelve months.

> ### Consulate of the United States of America.
> ### For the Empire of Morocco.

#### TO ALL WHOM IT MAY CONCERN.

Be it known. Whereas the undersigned, James R. Leib, a citizen
of the United States of North America, and now their resident consul
at Tangier, having been duly appointed commissioner, by *letters patent*,
under the signature of the President and seal of the United States of
North America, bearing date, at the city of Washington, the 4th day
of July A. D. 1835, for negotiating and concluding a treaty of *peace
and friendship* between the United States of North America and the
Empire of Morocco; I, therefore, James R. Leib, Commissioner as
aforesaid, do conclude the foregoing treaty and every article and clause
therein contained; reserving the same, nevertheless, for the final ratifica- *Final ratification reserved for President U. S.*
tion of the President of the United States of North America, by and
with the advice and consent of the Senate.

In testimony whereof, I have hereunto affixed my signature, and the
seal of this consulate, on the 1st day of October, in the year of
our Lord one thousand eight hundred and thirty-six, and of the
Independence of the United States the sixty-first.

JAMES R. LEIB, (L. S.)

---

# GENERAL CONVENTION OF PEACE, FRIENDSHIP,
# COMMERCE, AND NAVIGATION,

## Between the United States of America and the Peru-Bolivian Confederation.

*Nov. 13, 1836.*

*Ratifications exchanged, May 28, 1838. Proclamation of the President of the U. S., Oct. 3, 1838.  Peace and friendship.*

THE United States of America and the Peru-Bolivian Confederation,
desiring to make firm and permanent the peace and friendship which
happily subsist between them, have resolved to fix, in a clear, distinct,
and positive manner, the rules which shall, in future, be religiously
observed between the one and the other, by means of a treaty, or general
convention of peace, friendship, commerce, and navigation.

For this desirable purpose, the President of the United States of *Negotiators.*
America has conferred full powers on Samuel Larned, Chargé d'Af-
faires of the said States, near the Government of Peru; and the
Supreme Protector of the north and south Peruvian States, President
of the Republic of Bolivia, encharged with the direction of the foreign
relations of the Peru-Bolivian Confederation, has conferred like powers
on John Garcia del Rio, Minister of State in the Department of Finance



Case 1:20-cv-05574-ER   Document 6   Filed 08/17/20   Page 39 of 60

Pending debate,

The President announced that the morning hour had expired, and called up for consideration the unfinished business of the Senate of yesterday; and

The Senate resumed the consideration of the joint resolution (S. 16) proposing amendments to the Constitution of the United States; and,

On the question, Will the Senate concur in the amendment made to the joint resolution in Committee of the Whole?

After debate,

On motion by Mr. Saulsbury to amend the amendment made in Committee of the Whole, by striking out the words "Article xiii, section 1. Neither slavery nor involuntary servitude, except as a punishment for crime, whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction.  Section 2. Congress shall have power to enforce this article by appropriate legislation;" and inserting, in lieu thereof, the following:

### ARTICLE XIII.

SECTION 1. All persons shall have the right peaceably to assemble and worship God according to the dictates of their own conscience.

SEC. 2. The use of the public press shall not be obstructed; but criminal publications made in one State against the lawful institutions of another State shall not be allowed.

SEC. 3. The right of citizens to free and lawful speech in public assemblies shall not be denied.  Access of citizens to the ballot-box shall not be obstructed either by civil or military power.  The military shall always be subordinate to the existing judicial authority over citizens.  The privilege of the writ of *habeas corpus* shall never be suspended in the presence of the judicial authority.

SEC. 4. The militia of a State or of the United States shall not be employed to invade the lawful rights of the people of any of the several States; but the United States shall not be hereby deprived of the right and power to defend and protect its property and rights within the limits of any of the States.

SEC. 5. Persons held to service or labor for life, in any State under the laws thereof, may be taken into any Territory of the United States south of north latitude 36° 30', and the right to such service or labor shall not be impaired thereby, and the Territorial legislature thereof shall have the exclusive right to make and shall make all needful rules and regulations for the protection of such right, and also for the protection of such persons; but Congress or  any Territorial legislature shall not have power to impair or abolish such right of service in the said Territory while in a Territorial condition without  the consent of all the States south of said latitude which maintain such service.

SEC. 6. Involuntary servitude, except for crime, shall not be permanently established within the District set apart for the seat of government of the United States; but the right of sojourn in such District with persons held to service or labor for life shall not be denied.

SEC. 7. When any Territory of the United States south of north latitude 36° 30' shall have a population equal to the ratio of representation for one member of Congress, and the people thereof shall have formed a constitution for a republican form of government, it shall be admitted as a State into the Union, on an equal footing with the other States; and the people may in such constitution either prohibit or sustain the right to involuntary labor or service, and alter or amend the constitution at their will.

SEC. 8. The present right of representation in section two, article one, of this Constitution shall not be altered without the consent of all the States maintaining the right to involuntary service or labor south of latitude 36° 30,' but

art. 1 section
U.S Const.

nothing in this Constitution or its amendments shall be construed to deprive any State south of the right of said latitude 36° 30′ of abolishing involuntary servitude at its will.

SEC. 9. The regulation and control of the right to labor or service in any of the States south of latitude 36° 30′ is hereby recognized to be exclusively the right of each State within its own limits; and this Constitution shall not be altered or amended to impair this right of each State without its consent: *Provided*, This article shall not be construed to absolve the United States from rendering assistance to suppress insurrections or domestic violence, when called upon by any State, as provided for in section four, article four, of this Constitution.

SEC. 10. No State shall pass any law in any way interfering with or obstructing the recovery of fugitives from justice, or from labor or service, or any law of Congress made under article four, section two, of this Constitution; and all laws in violation of this section may, on complaint made by any person or State, be declared void by the Supreme Court of the United States.

SEC. 11. As a right of comity between the several States south of latitude 36° 30′ the right of transit with persons held to involuntary labor or service from one State to another shall not be obstructed, but such persons shall not be brought into the States north of said latitude.

SEC. 12. The traffic in slaves with Africa is hereby forever prohibited on pain of death and the forfeiture of all the rights and property of persons engaged therein ; and the descendants of Africans shall not be citizens.

SEC. 13. Alleged fugitives from labor or service, on request, shall have a trial by jury before being returned.

SEC. 14. All alleged fugitives charged with crime committed in violation of the laws of a State shall have the right of trial by jury, and if such person claims to be a citizen of another State, shall have a right of appeal or of a writ of error to the Supreme Court of the United States.

SEC. 15. All acts of any inhabitant of the United States tending to incite persons held to service or labor to insurrection or acts of domestic violence, or to abscond, are hereby prohibited and declared to be a penal offence, and all the courts of the United States shall be open to suppress and punish such offences at the suit of any citizen of the United States or the suit of any State.

SEC. 16. All conspiracies in any State to interfere with lawful rights in any other State or against the United States shall be suppressed; and no State or the people thereof shall withdraw from this Union without the consent of three-fourths of all the States, expressed by an amendment proposed and ratified in the manner provided in article five of the Constitution.

SEC. 17. Whenever any State wherein involuntary servitude is recognized or allowed shall propose to abolish such servitude, and shall apply for pecuniary assistance therein, the Congress may in its discretion grant such relief, not exceeding one hundred dollars, for each person liberated; but Congress shall not propose such abolishment or relief to any State.

Congress may assist free persons of African descent to emigrate and civilize Africa.

SEC. 18. Duties on imports may be imposed for revenue, but shall not be excessive or prohibitory in amount.

SEC. 19. When all of the several States shall have abolished slavery, then and thereafter slavery or involuntary servitude, except as a punishment for crime, shall never be established or tolerated in any of the States or Territories of the United States, and they shall be forever free.

SEC. 20. The provisions of this article relating to involuntary labor or servitude shall not be altered without the consent of all the States maintaining such servitude:

It was determined in the negative.

On the question to concur in the amendment made in Committee of the Whole,
It was determined in the affirmative,

No further amendment being made to the joint resolution,

*Ordered,* That it be engrossed and read a third time.

The said resolution was read the third time.

On the question, Shall the joint resolution pass?

It was determined in the affirmative, { Yeas.................... 38
                                       { Nays.................... 6

On motion by Mr. Powell,

The yeas and nays being desired by one fifth of the senators present,
Those who voted in the affirmative are,

Messrs. Anthony, Brown, Chandler, Clark, Collamer, Conness, Cowan, Dixon, Doolittle, Fessenden, Foot, Foster, Grimes, Hale, Harding, Harlan, Harris, Henderson, Howard, Howe, Johnson, Lane of Indiana, Lane of Kansas, Morgan, Morrill, Nesmith, Pomeroy, Ramsey, Sherman, Sprague, Sumner, Ten Eyck, Trumbull, Van Winkle, Wade, Wilkinson, Willey, Wilson.

Those who voted in the negative are,

Messrs. Davis, Hendricks, McDougall, Powell, Riddle, Saulsbury.

So it was *Resolved,* (two-thirds of the senators present concurring,) That the joint resolution pass.

On motion, the title was amended to read: A joint resolution submitting to the legislatures of the several States a proposition to amend the Constitution of the United States.

*Ordered,* That the Secretary request the concurrence of the House of Representatives therein.

Mr. Doolittle presented a memorial of the legislature of Wisconsin, praying the passage of an act for the issue of patents to lands purchased of the Stockbridge Indians, in conformity with an act approved March 3, 1843, and recommending the sale of all unsold lands of the Stockbridge reservations, and that the price be fixed at one dollar and twenty-five cents per acre; which was referred to the Committee on Indian Affairs.

On motion by Mr. Morrill,

*Ordered,* That the Committee on Claims be discharged from the further consideration of the memorial of certain contractors for, and builders of, side-wheel gunboats, known as "double-enders," for an additional allowance on their contracts, and that it be referred to the Committee on Naval Affairs.

The Vice-President signed the enrolled bills, (S. 79, S. 82, S. 155, S. 163, H. R. C. C. 114, H. R. C. C. 115, H. R. C. C. 116, H. R. 302, and H. R. 373,) last reported to have been examined, and they were delivered to the committee to be presented to the President of the United States.

On motion by Mr. Grimes,

*Ordered,* That when the Senate adjourn, it be to Monday next; and

On motion by Mr. Lane, of Indiana,

The Senate adjourned.


MONDAY, APRIL 11, 1864.

The Vice-President being absent, the Secretary called the Senate to order and read the following letter:

VICE-PRESIDENT'S CHAMBER,
*Washington, April 9, 1864.*

SIR: I shall be absent from the city on Monday next. Please communicate information of this fact to the Senate on Monday morning.

Yours, very respectfully,

H. HAMLIN.

Hon. J. W. FORNEY, *Secretary of the Senate.*

Mr. John R. Eden,
Joseph K. Edgerton,
Charles A. Eldridge,
William E. Finck,
John Ganson,
Henry Grider,
William A. Hall,
Aaron Harding,
Henry W. Harrington,
Benjamin G. Harris,
Charles M. Harris,
William S. Holman,

Mr. Philip Johnson,
William Johnson,
Martin Kalbfleisch,
Francis Kernan,
Anthony L. Knapp,
John Law,
Alexander Long,
Robert Mallory,
William H. Miller,
James R. Morris,
William R. Morrison,

Mr. Warren P. Noble,
John O'Neill,
George H. Pendleton,
Nehemiah Perry,
John V. L. Pruyn,
Samuel J. Randall,
James C. Robinson,
Lewis W. Ross,
John G. Scott,
William G. Steele,
John D. Stiles,

Mr. Myer Strouse,
John T. Stuart,
Lorenzo D. M. Sweat,
Dwight Townsend,
William H. Wadsworth,
Elijah Ward,
Chilton A. White,
Joseph W. White,
Charles H. Winfield,
Benjamin Wood,
Fernando Wood.

Those who voted in the negative are—

Mr. John B. Alley,
William B. Allison,
Oakes Ames,
Lucien Anderson,
Isaac N. Arnold,
James M. Ashley,
Joseph Baily,
Augustus C. Baldwin,
John D. Baldwin,
Portus Baxter,
Fernando C. Beaman,
James G. Blaine,
Jacob B. Blair,
Henry T. Blow,
George S. Boutwell,
Sempronius H. Boyd,
Augustus Brandegee,
John M. Broomall,
William G. Brown,
Ambrose W. Clark,
Freeman Clarke,
Amasa Cobb,
Alexander H. Coffroth,
Cornelius Cole,
John A. J. Creswell,
Henry Winter Davis,
Thomas T. Davis,
Henry L. Dawes,

Mr. Henry C. Deming,
Nathan F. Dixon,
Ignatius Donnelly,
John F. Driggs,
Ebenezer Dumont,
Ephraim R. Eckley,
Thomas D. Eliot,
John F. Farnsworth,
Augustus Frank,
James A. Garfield,
Daniel W. Gooch,
Josiah B. Grinnell,
John A. Griswold,
James T. Hale,
Anson Herrick,
William Higby,
Samuel Hooper,
Giles W. Hotchkiss,
Asahel W. Hubbard,
John H. Hubbard,
Calvin T. Hulburd,
Ebon C. Ingersoll,
Thomas A. Jenckes,
George W. Julian,
John A. Kasson,
William D. Kelley,
Francis W. Kellogg,
Orlando Kellogg,

Mr. Austin A. King,
Samuel Knox,
DeWitt C. Littlejohn,
Benjamin F. Loan,
John W. Longyear,
James M. Marvin,
Archibald McAllister,
John R. McBride,
Joseph W. McClurg,
Walter D. McIndoe,
Samuel F. Miller,
James K. Moorhead,
Justin S. Morrill,
Daniel Morris,
Amos Myers,
Leonard Myers,
Jesse O. Norton,
Moses F. Odell,
Charles O'Neill,
Godlove S. Orth,
James W. Patterson,
Sidney Perham,
Frederick A. Pike,
Theodore M. Pomeroy,
Hiram Price,
William H. Randall,
Alexander H. Rice,
John H. Rice,

Mr. Edward H. Rollins,
James S. Rollins,
Robert C. Schenck,
Glenni W. Scofield,
Thomas B. Shannon,
Ithamar C. Sloan,
Green Clay Smith,
Nathaniel B. Smithers,
Rufus P. Spalding,
John F. Starr,
Thaddeus Stevens,
M. Russell Thayer,
Francis Thomas,
Henry W. Tracy,
Charles Upson,
R. B. Van Valkenburgh,
Elihu B. Washburne,
William B. Washburn,
Edwin H. Webster,
Ezra Wheeler,
Thomas Williams,
A. Carter Wilder,
James F. Wilson,
William Windom,
Fred'ck E. Woodbridge,
Henry G. Worthington,
George H. Yeaman.

Those not voting are—

Mr. James E. English,
Wells A. Hutchins,
Jesse Lazear,
Francis C. Le Blond,

Mr. Daniel Marcy,
James F. McDowell,
John F. McKinney,
George Middleton,

Mr. Homer A. Nelson,
William Radford,
Andrew J. Rogers,

Mr. John B. Steele,
Daniel W. Voorhees,
Kellian V. Whaley.

So the House refused to lay the motion to reconsider on the table.

The question then recurring on the demand for the previous question, it was seconded and the main question ordered and put, viz: Shall the vote by which the said joint resolution was rejected be reconsidered?

And it was decided in the affirmative, { Yeas ......................... 112
{ Nays ......................... 57
{ Not voting ................... 13

The yeas and nays being desired by one-fifth of the members present,

Those who voted in the affirmative are—

Mr. John B. Alley,
William B. Allison,
Oakes Ames,
Lucien Anderson,
Isaac N. Arnold,
James M. Ashley,
Joseph Baily,
John D. Baldwin,
Portus Baxter,
Fernando C. Beaman,
James G. Blaine,
Jacob B. Blair,
Henry T. Blow,
George S. Boutwell,
Sempronius H. Boyd,
Augustus Brandegee,
John M. Broomall,
William G. Brown,
Ambrose W. Clark,
Freeman Clarke,
Amasa Cobb,

Mr. Alexander H. Coffroth,
Cornelius Cole,
John A. J. Creswell,
Henry Winter Davis,
Thomas T. Davis,
Henry L. Dawes,
Henry C. Deming,
Nathan F. Dixon,
Ignatius Donnelly,
John F. Driggs,
Ebenezer Dumont,
Ephraim R. Eckley,
Thomas D. Eliot,
James E. English,
John F. Farnsworth,
Augustus Frank,
James A. Garfield,
Daniel W. Gooch,
Josiah B. Grinnell,
John A. Griswold,
James T. Hale,

Mr. Anson Herrick,
William Higby,
Samuel Hooper,
Giles W. Hotchkiss,
Asahel W. Hubbard,
John H. Hubbard,
Calvin T. Hulburd,
Ebon C. Ingersoll,
Thomas A. Jenckes,
George W. Julian,
John A. Kasson,
William D. Kelley,
Francis W. Kellogg,
Orlando Kellogg,
Austin A. King,
Samuel Knox,
DeWitt C. Littlejohn,
Benjamin F. Loan,
John W. Longyear,
James M. Marvin,
Archibald McAllister,

Mr. John R. McBride,
Joseph W. McClurg,
Walter D. McIndoe,
Samuel F. Miller,
James K. Moorhead,
Justin S. Morrill,
Daniel Morris,
Amos Myers,
Leonard Myers,
Jesse O. Norton,
Moses F. Odell,
Charles O'Neill,
Godlove S. Orth,
James W. Patterson,
Sidney Perham,
Frederick A. Pike,
Theodore M. Pomeroy,
Hiram Price,
William H. Randall,
Alexander H. Rice,
John H. Rice,

Mr. Edward H. Rollins
James S. Rollins
Robert C. Schenck
Glenni W. Scofield
Thomas B. Shannon
Ithamar C. Sloan
Green Clay Smith

Mr. Nathaniel B. Smithers
Rufus P. Spalding
John F. Starr
Thaddeus Stevens
M. Russell Thayer
Francis Thomas
Henry W. Tracy

Mr. Charles Upson
R. B. Van Valkenburgh
Elihu B. Washburne
William B. Washburn
Edwin H. Webster
Kellian V. Whaley
Ezra Wheeler

Mr. Thomas Williams
A. Carter Wilder
James F. Wilson
William Windom
Fred'ck E. Woodbridge
Henry G. Worthington
George H. Yeaman.

Those who voted in the negative are—

Mr. James C. Allen
William J. Allen
Sydenham E. Ancona
George Bliss
James Brooks
James S. Brown
John W. Chanler
Brutus J. Clay
Samuel S. Cox
James A. Cravens
John L. Dawson
Charles Denison
John R. Eden
Joseph K. Edgerton
Charles A. Eldridge

Mr. William E. Finck
John Ganson
Henry Grider
William A. Hall
Aaron Harding
Henry W. Harrington
Benjamin G. Harris
Charles M. Harris
William S. Holman
Philip Johnson
William Johnson
Martin Kalbfleisch
Francis Kernan
Anthony L. Knapp

Mr. John Law
Alexander Long
Robert Mallory
William H. Miller
James R. Morris
William H. Morrison
Warren P. Noble
John O'Neill
George H. Pendleton
Nehemiah Perry
John V. L. Pruyn
Samuel J. Randall
James C. Robinson
Lewis W. Ross

Mr. John G. Scott
William G. Steele
John D. Stiles
Myer Strouse
John T. Stuart
Lorenzo D. M. Sweat
Dwight Townsend
William H. Wadsworth
Elijah Ward
Chilton A. White
Joseph W. White
Charles H. Winfield
Benjamin Wood
Fernando Wood.

Those not voting are—

Mr. Augustus C. Baldwin
Wells A. Hutchins
Jesse Lazear
Francis L. Le Blond

Mr. Daniel Marcy
James F. McDowell
John F. McKinney

Mr. George Middleton
Homer A. Nelson
William Radford

Mr. Andrew J. Rogers
John B. Steele
Daniel W. Voorhees.

So the motion to reconsider was agreed to.

The question again recurring on the passage of the said joint resolution,
Mr. Ashley moved the previous question; which was seconded and the
main question ordered and put, viz: Shall the joint resolution pass?

And it was decided in the affirmative,
$\begin{cases} \text{Yeas} & 119 \\ \text{Nays} & 56 \\ \text{Not voting} & 8 \end{cases}$

Two-thirds voting in favor thereof.
The yeas and nays being desired by one-fifth of the members present,
Those who voted in the affirmative are—

Mr. John B. Alley
William B. Allison
Oakes Ames
Lucien Anderson
Isaac N. Arnold
James M. Ashley
Joseph Baily
Augustus C. Baldwin
John D. Baldwin
Portus Baxter
Fernando C. Beaman
James G. Blaine
Jacob B. Blair
Henry T. Blow
George S. Boutwell
Sempronius H. Boyd
Augustus Brandegee
John M. Broomall
William G. Brown
Ambrose W. Clark
Freeman Clarke
Amasa Cobb
Alexander H. Coffroth
Cornelius Cole
John A. J. Creswell
Henry Winter Davis
Thomas T. Davis
Henry L. Dawes
Henry C. Deming
Nathan F. Dixon

Mr. Ignatius Donnelly
John F. Driggs
Ebenezer Dumont
Ephraim R. Eckley
Thomas D. Eliot
James E. English
John F. Farnsworth
Augustus Frank
John Ganson
James A. Garfield
Daniel W. Gooch
Josiah B. Grinnell
John A. Griswold
James T. Hale
Anson Herrick
William Higby
Samuel Hooper
Giles W. Hotchkiss
Asahel W. Hubbard
John H. Hubbard
Calvin T. Hulburd
Wells A. Hutchins
Ebon C. Ingersoll
Thomas A. Jenckes
George W. Julian
John A. Kasson
William D. Kelley
Francis W. Kellogg
Orlando Kellogg
Austin A. King

Mr. Samuel Knox
DeWitt C. Littlejohn
Benjamin F. Loan
John W. Longyear
James M. Marvin
Archibald McAllister
John R. McBride
Joseph W. McClurg
Walter D. McIndoe
Samuel F. Miller
James K. Moorhead
Justin S. Morrill
Daniel Morris
Amos Myers
Leonard Myers
Homer A. Nelson
Jesse O. Norton
Moses F. Odell
Charles O'Neill
Godlove S. Orth
James W. Patterson
Sidney Perham
Frederick A. Pike
Theodore M. Pomeroy
Hiram Price
William Radford
William H. Randall
Alexander H. Rice
John H. Rice
Edward H. Rollins

Mr. James S. Rollins
Robert C. Schenck
Glenni W. Scofield
Thomas B. Shannon
Ithamar C. Sloan
Green Clay Smith
Nathaniel B. Smithers
Rufus P. Spalding
John F. Starr
John B. Steele
Thaddeus Stevens
M. Russell Thayer
Francis Thomas
Henry W. Tracy
Charles Upson
R. B. Van Valkenburgh
Elihu B. Washburne
William B. Washburn
Edwin H. Webster
Kellian V. Whaley
Ezra Wheeler
Thomas Williams
A. Carter Wilder
James F. Wilson
William Windom
Fred'ck E. Woodbridge
Henry G. Worthington
George H. Yeaman,
and Schuyler Colfax,
Speaker.

Those who voted in the negative are—

Mr. James C. Allen
William J. Allen
Sydenham E. Ancona
George Bliss

Mr. James Brooks
James S. Brown
John W. Chanler
Brutus J. Clay

Mr. Samuel S. Cox
James A. Cravens
John L. Dawson
Charles Denison

Mr. John R. Eden
Joseph K. Edgerton
Charles A. Eldridge
William E. Finck



COUNCIL OF THE CITY OF PHILADELPHIA
OFFICE OF THE CHIEF CLERK
ROOM 402, CITY HALL
PHILADELPHIA

(Resolution No. 1202)

RESOLUTION

Honoring the Moorish-American Society of Philadelphia.

WHEREAS, The Moorish-American Society of Philadelphia is a thriving vital community made up of Moors who have sought a better life and brighter future for their children as they journeyed here from the desert plains of Morocco; and

WHEREAS, The Moorish-American community has readily adopted the principles of freedom and democracy so necessary for their assimilation into the larger family of Americans from all manner of ethnic, religious, cultural and racial backgrounds; and

WHEREAS, These Americans, who hail from a proud and ancient culture whose influence in philosophy, architecture and the arts has helped define North African

4

CERTIFICATION: This is a true and correct copy of the original Resolution adopted by the Council of the City of Philadelphia on the twelfth day of September, 1991.

ATTEST:

*Joseph E. Coleman*

President of City Council

*Maria B. Laurin*

Deputy Chief Clerk of the Council

Introduced by
DAVID COHEN

1-18629



# STATE OF ILLINOIS

### To all to whom these Presents Shall Come, Greeting:

**Whereas,** a CERTIFICATE duly signed and acknowledged has been filed in the Office of the Secretary of State on the 24th day of November 1919 for the organization of the MONTER SCHOOL OF SCIENCE

Now, Therefore, I, LOUIS L. EMMERSON, Secretary of State of the State of Illinois, by virtue of the powers and duties vested in me by law, do hereby certify that the said MONTER SCHOOL OF SCIENCE

is a legal corporation of this State, under the laws of this State.

**In Testimony Whereof,** I hereto set my hand and cause to be affixed the Great Seal of the State of Illinois. Done at the City of Springfield this 24th day of November A.D. 1919 and of the Independence of the United States

CERTIFICATE Case 1:03-cv-00971-EM Document 8 Filed 08/17/20 Page 48 of 60 PAID

**STATE OF ILLINOIS**

Cook     County. ss.

NOV 29 1926

To LOUIS L. EMMERSON, Secretary of State:

We, the undersigned    Drew Ali, Jesse Lomax, Johnny Reynolds, Eddie Watts,

Sammy Tucker.

citizens of the United States, propose to form a corporation under an Act of the General Assembly of the State of Illinois entitled, "An Act concerning Corporations," approved April 18, 1872, and all acts amendatory thereof; and for the purpose of such organization we hereby state as follows, to-wit:

1. The name of such corporation is    Moorish Temple of Science.

2. The object for which it is formed is    To uplift fallen Humanity and teach

those things necessary to make men and women become better

citizens.

4. The management of the aforesaid   Moorish Temple of Science   shall be vested in a board of
FIVE     Directors.

5. The following persons are hereby selected as the Directors to control and manage said corporation for the first year of its corporate existence, viz:

| NAME | NUMBER | STREET | CITY | STATE |
|---|---|---|---|---|
| Drew Ali | 3603 Indiana Ave. | | Chicago Ill. | |
| Jesse Lomax | 3614 Prairie Ave. | | Chicago Ill. | |
| Johnny Reynolds | 3603 Indiana Ave. | | Chicago Ill. | |
| Eddie Watts | 3603 Indiana Ave. | | Chicago Ill. | |
| Sammy Tucker | 3705 Calumet Ave. | | Chicago Ill. | |

6. The location is in the city of   Chicago   in the County of   Cook

in the State of Illinois, and the post office address of its principal office is at No.   3603 Indiana Ave.,

    Street, in the said city of   Chicago.

SIGNED

County of _____ Cook _____

I hereby certify that at a _____ Special _____ meeting of the members of the

_____ Moorish Temple of Science, Chicago, Illinois _____ N-10649

held on _____ the 2nd., day of May _____ A.D. 192 8 , at _____ o'clock _____ P. M., pursuant to
the rules of said corporation, the following resolution was adopted in accordance with the By-Laws of said
corporation;

on the 2nd., day of May 1928, for the purpose of changing the

name of the said corporation; hereby make application to the

Secretary of State of Illinois, to change the name of the Moorish

Temple of Science to The Moorish Science Temple of America;

STATE OF ILLINOIS,
County of COOK

Case 1:20-cv-03574-ER   Document 6   Filed 08/17/20   Page 55 of 60

10105905

STATE OF ILLINOIS)
COOK COUNTY  ) SS. NO.2
FILED FOR RECORD

1928 AUG 1  PM  2 52

AND RECORDED IN
BOOK            PAGE
RECORDER

**State of Illinois,**

County of COOK

I, NOBLE DREW ALI,

do solemnly swear that at a meeting of the members of the MOORISH SCIENCE TEMPLE

OF AMERICA                           held at Chicago

in the County of     Cook        and State of Illinois, on the   20th

day of     July         A. D. 1928, for that purpose, the following persons were

duly appointed                        the present TRUSTEES

according to the rules and usages of such

CONGREGATION OF MOORISH SCIENCE

MOHAMMED, ALLAH BEING THE ALLAH, PROPHET ALI, AND FORMING HIS

the Moorish Science Temple of America derives its power and authority

from the great Koran of Mohammed to propagate the faith and extend the

learning and truth of the great prophet of Allah in America.  To appoint

appoint and consecrate missionaries of the prophet and to establish the

faith of Mohammed in America.

MOORISH SCIENCE TEMPLE OF AMERICA

MOORISH SCIENCE TEMPLE OF AMERICA

Subscribed and Sworn to before me

Dew Ali

Salvation  Our God  Unity 

# The Moorish Science Temple
## OF AMERICA
## The Divine Constitution and By-Laws



**NOBLE DREW ALI**
Founder

ACT 1.—The Grand Sheik and the chairman of the Moorish Science Temple of America is in power to make law and enforce laws with the assistance of the Prophet and the Grand Body of the Moorish Science Temple of America. The assistant Grand Sheik is to assist the Grand Sheik in all affairs if he lives according to Love, Truth, Peace, Freedom and Justice, and it is known before the members of the Moorish Science Temple of America.

ACT 2.—All meetings are to be opened and closed promptly according to the circle seven and Love, Truth, Peace, Freedom and Justice. Friday is our Holy Day of rest, because on a Friday the first man was formed in flesh and on a Friday the first man departed out of flesh and ascended unto his father God Allah, for that cause Friday is the Holy Day for all Moslems all over the world.

ACT 3.—Love, Truth, Peace, Freedom and Justice must be proclaimed and practised by all members of the Moorish Science Temple of America. No member is to put in danger or accuse falsely his brother or sister on any occasion at all that may harm his brother or sister, because Allah is Love.

ACT 4.—All members must preserve these Holy and Divine laws, and all members must obey the laws of the government, because by being a Moorish American, you are a part and partial of the government, and must live the life accordingly.

ACT 5.—This organization of the Moorish Science Temple of America is not to cause any confusion or to overthrow the laws and constitution of the said government but to obey hereby.

ACT 6.—With us all members must proclaim their nationality and we are teaching our people their nationality and their Divine Creed that they may know that they are a part and a partial of this said government, and know that they are not Negroes, Colored Folks, Black People or Ethiopians, because these names were given to slaves by slave holders in 1779 and lasted until 1865 during the time of slavery, but this is a new era of time now, and all men now must proclaim their free national name to be recognized by the government in which they live and the nations of the earth, this is the reason why Allah the Great God of the universe ordained Noble Drew Ali, the Prophet to redeem his people from their sinful ways. The Moorish Americans are the descendants of the ancient Moabites whom inhabited the North Western and South Western shores of Africa.

ACT 7.—All members must promptly attend their meetings and become a part and a partial of all uplifting acts of the Moorish Science Temple of America. Members must pay their dues and keep in line with all necessities of the Moorish Science Temple of America, then you are entitled to the name of, "Faithful". Husband, you must support your wife and children; wife you must obey your husband and take care of your children and look after the duties of your household. Sons and daughters must obey father and mother and be industrious and become a part of the uplifting of fallen humanity. All Moorish Americans must keep their hearts and minds pure with love, and their bodies clean with water. This Divine Covenant is from your Holy Prophet Noble Drew Ali, thru the guidance of his Father God Allah.

MOORISH AMERICAN PRAYER

Allah the Father of the universe, the Father of Love, Truth, Peace, Freedom and Justice. Allah is my protector, my guide and my salvation by night and by day thru his Holy Prophet Drew Ali. "Amen."

# THE MOORISH SCIENCE TEMPLE OF AMERICA
## Home Office: 48 Inches Street          Mt. Clemens, Michigan





*City of*
**Fayetteville**
*North Carolina*

# PROCLAMATION

**WHEREAS,** Moorish Americans are the descendants of the ancient Moabites, Hamatites, and Canaanites who were permitted by the Old Pharaohs of Kemet to cross from East Africa and later formed kingdoms extending from the northwestern and southwestern shores of Africa, the Atlantic Islands onto the present day Continental Americas; **AND**

**WHEREAS,** the native Moorish Peoples of the Americas are now united in order to again link themselves with the family of nations; **AND**

**WHEREAS,** the Moorish Americans have formed a sovereign Theocratic Government guided by the principles of love, truth, peace, freedom, and justice through virtue of the universal right to self-determination as well as with the Declaration on the Rights of Indigenous Peoples guaranteed in the Charter of the United Nations; **AND**

**WHEREAS,** on January 8, 1886, Noble Drew Ali was born in the State of North Carolina and destined to become the first Patriot of the Moorish American People; **AND**

**WHEREAS,** in 1912, Noble Drew Ali was anointed as El Hajj Sharif Abdul Ali by the heads of Egypt and the Holy City of Mecca to return to the United States as the Last Prophet and Founding Father of the newly risen Nation of Moorish Americans; **AND**

**WHEREAS,** as a result of the Congressional ratification of the 13th amendment in 1865, the Moorish peoples were emancipated from slavery.

**NOW THEREFORE,** I, Anthony G. Chavonne, Mayor of the City of Fayetteville, North Carolina, do hereby proclaim January 8-15, 2012, to be

# MOORISH AMERICAN WEEK

*Anthony G. Chavonne*

Anthony G. Chavonne
Mayor



*LIBRARY OF CONGRESS*

*Copyright Office*
*of the United States*

*WASHINGTON, D.C.*

## ADDITIONAL CERTIFICATE OF REGISTRATION
## OF A CLAIM TO COPYRIGHT



THIS IS TO CERTIFY THAT THE STATE-
MENTS SET FORTH IN THE ATTACHED
HAVE BEEN MADE A PART OF THE
RECORDS OF THE COPYRIGHT OFFICE
WITH CLAIM OF COPYRIGHT REGIS-
TERED UNDER NUMBER
AA 209316

IN TESTIMONY WHEREOF,
THE SEAL OF THIS OFFICE IS
AFFIXED HERETO ON

September 30, 1996

*Marybeth Peters*

REGISTER OF COPYRIGHTS
*United States of America*
**REGISTER OF COPYRIGHTS**

C-731 May 1995 — 5,000

# APPLICATION FOR REGISTRATION
## OF A CLAIM TO COPYRIGHT IN A BOOK PUBLISHED IN THE UNITED STATES OF AMERICA

| REGISTRATION NO. | CLASS |
|---|---|
| AA  209316 | **A** |
| DO NOT WRITE HERE | |

**FORM A**

INSTRUCTIONS.—Fill in the applicable items on all pages. Pages 1 and 2 should be original copies either printed with pen and ink or typewritten. Page 1a will be returned to you as your Certificate of Registration and therefore should be filled in with care to agree with page 1. Carbon paper may be used for page 1a, but as most carbons will smudge, the Certificate will look neater if typed separately. Mail all pages to the Register of Copyrights, Library of Congress, Washington 25, D. C., together with two copies of the work and the registration fee of $4. Make your remittance payable to the Register of Copyrights. See page 2a for full instructions.

1. COPYRIGHT CLAIMANT OR CLAIMANTS (Full NAMES and ADDRESSES) :

   *Charles Mosley Bey*

   *

2. TITLE OF WORK ___ *Clock of Destiny*

3. AUTHORS (Includes Editors, Translators, etc.)    Full name, pseudonym, if any, and year of birth and, if dead, year of death, are requested for cataloging purposes. Citizenship *must* be given.

   (*a*) Name *Charles Mosley Bey*   Citizenship *Moorish American USA*
   <br>(First)    (Middle)    (Last)    (Give name of country)
   <br>Domicile *2633 E. 5th Street Cleveland, O.*   Birth *1877*   Death _____
   <br>(Address)    (Year)    (Year)

   (*b*) Name _____   Citizenship _____
   <br>(First)    (Middle)    (Last)    (Give name of country)
   <br>Domicile _____   Birth _____   Death _____
   <br>(Address)    (Year)    (Year)

4. (*a*) Check one of the following ONLY if your book is:
   - [x] A revised edition of a previously published book.
   - [ ] A translation.
   - [ ] A serial republished in book form with new matter.
   - [ ] United States edition of a book first published abroad on (Date) _____
     <br>in the English language and registered under Ad Interim No. _____

   (*b*) If checked above give title and author of original publication (if different from present book). Give brief statement of new matter in this edition.

   *(Masonry – Astrology) + history + geography.*
   <br>*Clock of Destiny*

5. SEND CERTIFICATE TO: (If refund or other communications are to be sent to another person, give his name in space 6.)

   Name *C. M. Bey*

   * Address *2633 E. 51st Street*
   <br>(Number and street)
   <br>*Cleveland*    *4*    *Ohio*
   <br>(City)    (Zone)    (State)

| FOR COPYRIGHT OFFICE USE ONLY |
|---|
| APPLICATION AND AFFIDAVIT RECEIVED |
| APR –3 1952 |
| TWO COPIES RECEIVED |
| 1 C. *Jan 18 '52* |
| 1 C. *Mar 12 '52* |
| FEE RECEIVED   *Mar 12 '52* |
| $4.00 |
| *Cash No. 17900* |

16—63824-1

**TURN THIS PAGE**

6. Name _____    Address _____

PAGE

# AFFIDAVIT

**IMPORTANT.**—Fill in this affidavit, sign it before an officer authorized to administer oaths within the United States, such as a notary public, who must place his signature, date of execution, and official seal upon the affidavit. The execution of this affidavit must be subsequent to the facts stated therein and must be made by an individual.

STATE OF _Ohio_

COUNTY OF _Cuyahoga_ } ss:

I, the undersigned, depose and say that I am the * duly authorized agent or representative residing in the United States of the * person claiming copyright in the book described in this application; that the copies of this book deposited in the Copyright Office were printed in the United States ** by _B. Johnson Printing & Publishing Co._
(Name of establishment doing printing)
at _Cleveland_ _Ohio_ from type set, plates made from type set,
(City) (State)
or by other process performed, in the United States by _B. Johnson Publishing Co._
(Name of establishment)
at _Cleveland_ _Ohio_ ; that if the text was produced by
(City) (State)
lithographic or photoengraving process, such process was wholly performed in the United States by _B. Johnson Publishing Co._ at _Cleveland_ _Ohio_ ;
(Name of establishment) (City) (State)
that the binding, if any, of this book was performed in the United States by _B. Johnson_
(Name of
_Printing Co._ at _Cleveland_ _Ohio_ ; that this book was
establishment doing binding) (City) (State)
published on _Jan. 15, 1952_ in the United States.
(Give month, day, and year when copies were first placed on sale, sold, or publicly distributed)

_(signature)_
Signature of affiant

(Sign and notarize *only* on or after date of publication)

PLACE
[NOTARIAL SEAL]
HERE
(Copyright Act makes use of official seal obligatory)

Subscribed and sworn to affirmed before me

this _2_ day of _March_ , 195_

_(signature)_
Signature of notary

*This affidavit is in form for use by an agent of the copyright claimant. The copyright law permits the affidavit to be made instead by the claimant himself or the printer of the book. If it is to be made by the former, cross out the words between the two single *. If it is to be made by a printer who is not an agent of the claimant, cross out these words and also the succeeding phrase "person claiming copyright in" and write in their place the words "printer of".

**See the provisions of sections 16 and 17 of Title 17 of the United States Code.

U. S. GOVERNMENT PRINTING OFFICE    16—63824-1



*LIBRARY OF CONGRESS*

*Copyright Office*
*of the United States*

*WASHINGTON, D.C.*

## ADDITIONAL CERTIFICATE OF REGISTRATION OF A CLAIM TO COPYRIGHT



THIS IS TO CERTIFY THAT THE STATE-
MENTS SET FORTH IN THE ATTACHED
HAVE BEEN MADE A PART OF THE
RECORDS OF THE COPYRIGHT OFFICE
WITH CLAIM OF COPYRIGHT REGIS-
TERED UNDER NUMBER

AA 222141

IN TESTIMONY WHEREOF,
THE SEAL OF THIS OFFICE IS
AFFIXED HERETO ON

September 30, 1996

*Marybeth Peters*

REGISTER OF COPYRIGHTS
*United States of America*
REGISTER OF COPYRIGHTS

C-731 May 1995 — 5,000

# APPLICATION FOR REGISTRATION
## OF A CLAIM TO COPYRIGHT IN A BOOK PUBLISHED
### IN THE UNITED STATES OF AMERICA

REGISTRATION NO.

AA  222141

CLASS

**A**

DO NOT WRITE HERE

FORM A

**INSTRUCTIONS.**—Fill in the applicable items on all pages.  Pages 1 and 2 should be original copies either printed with pen and ink or typewritten.  Page 1a will be returned to you as your Certificate of Registration and therefore should be filled in with care to agree with page 1.  Carbon paper may be used for page 1a, but as most carbons will smudge, the Certificate will look neater if typed separately.  Mail all pages to the Register of Copyrights, Library of Congress, Washington 25, D. C., together with two copies of the work and the registration fee of $4.  Make your remittance payable to the Register of Copyrights.  See page 2a for full instructions.

1. COPYRIGHT CLAIMANT OR CLAIMANTS (Full NAMES and ADDRESSES) :

_Charles Mosley Bey_

_2633 E. 5th St. Cleveland 4, Ohio_

2. TITLE OF WORK _Clock of Destiny Moorish identification Card with the Zodiac Constitution_

3. AUTHORS (Includes Editors, Translators, etc.)   Full name, pseudonym, if any, and year of birth and, if dead, year of death, are requested for cataloging purposes.  Citizenship *must* be given.

(a) Name _Charles_ _Mosley_ _Bey_
    (First)    (Middle)    (Last)

Citizenship _____
(Give name of country)

Domicile _2633 E. 5th St._
    (Address)

Birth _2.6.97_ Death _____
   (Year)    (Year)

(b) Name _____
    (First)    (Middle)    (Last)

Citizenship _Moorish American_
   (Give name of country)

Domicile _____
    (Address)

Birth _____ Death _____
   (Year)    (Year)

4. (a) Check one of the following ONLY if your book is:
- ☑ A revised edition of a previously published book.
- ☐ A translation.
- ☐ A serial republished in book form with new matter.
- ☐ United States edition of a book first published abroad on (Date) _____ in the English language and registered under Ad Interim No. _____

(b) If checked above give title and author of original publication (if different from present book).   Give brief statement of new matter in this edition.

_Charles Mosley Bey_

_Clock of Destiny Moorish American Nationality Card of Identification—with Zodiac Constitution_

5. SEND CERTIFICATE TO: (If refund or other communications are to be sent to another person, give his name in space 6.)

Name _Charles Mosley Bey_

Address _2633 E. 5th St._
    (Number and street)

_Cleveland_ _4_ _Ohio_
   (City)    (Zone)    (State)

6. Name _____ Address _____

FOR COPYRIGHT OFFICE USE ONLY

APPLICATION AND AFFIDAVIT RECEIVED

SEP 10 1952

TWO COPIES RECEIVED

JUN 3  1952

FEE RECEIVED  # 50534

JUL 29 1952

TURN THIS PAGE

16—63824-1

# AFFIDAVIT

IMPORTANT.—Fill in this affidavit, sign it before an officer authorized to administer oaths within the United States, such as a notary public, who must place his signature, date of execution, and official seal upon the affidavit. The execution of this affidavit must be subsequent to the facts stated therein and must be made by an individual.

STATE OF _____ *OHIO* _____ 

COUNTY OF _____ *CUYAHOGA* _____ } ss:

I, the undersigned, depose and say that I am the * duly authorized agent or representative residing in the United States of the * person claiming copyright in the book described in this application; that the copies of this book deposited in the Copyright Office were printed in the United States ** by *Bagby printing Co.*

at *Cleveland* *Ohio* _____ from type set, plates made from type set,
　(City)　　　　　　　　(State)

or by other process performed, in the United States by *Bagby printing Co.*
　　　　　　　　　　　　　　　　　　　　　(Name of establishment)

at *Cleveland* *Ohio* _____ ; that if the text was produced by
　(City)　　　　　　　(State)

lithographic or photoengraving process, such process was wholly performed in the United States by

*Bagby Printing Co.* at *Cleveland* *Ohio* ;
　(Name of establishment)　　　　　　　(City)　　　　　(State)

that the binding, if any, of this book was performed in the United States by *Bagby* 
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　(Name of

*Printing Co.* at *Cleveland* *Ohio* ; that this book was
establishment doing binding)　　(City)　　　　　(State)

published on *April 22, 1952* _____ in the United States.
　　　　　(Give month, day, and year when copies were first placed on sale, sold, or publicly distributed)

x _____
　　　　　　Signature of affiant

(Sign and notarize *only* on or after date of publication)

PLACE
[NOTARIAL SEAL]
HERE

(Copyright Act makes use of official seal obligatory)

Subscribed and sworn to affirmed before me

this _8_ day of *September* , 19_52_

*Thomas S. Watson*
　　Signature of notary
*Com expires 7/4/54*

*This affidavit is in form for use by an agent of the copyright claimant. The copyright law permits the affidavit to be made instead by the claimant himself or the printer of the book. If it is to be made by the former, cross out the words between the two single *. If it is to be made by a printer who is not an agent of the claimant, cross out these words and also the succeeding phrase "person claiming copyright in" and write in their place the words "printer of".
**See the provisions of sections 16 and 17 of Title 17 of the United States Code.

U. S. GOVERNMENT PRINTING OFFICE   16—63824-1